Case No. 24-13543

————————————

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

————————————

STEVEN W. HERNANDEZ and DAVID DRWENCKE,
on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants,*

v.

FLORIDA BOARD OF BAR EXAMINERS and MICHELE A.
GAVAGNI, Executive Director of the Florida Board of Bar Examiners,
in both her individual and official capacities,

*Defendants-Appellees.*

————————————

On Appeal from the United States District Court
for the Northern District of Florida (Case No. 4:21-cv-00247)
The Honorable Allen C. Winsor

———————————————————————————————

**APPELLANTS' BRIEF**

———————————————————————————————

Adam W. Hansen
APOLLO LAW LLC
333 Washington Avenue North
Suite 300
Minneapolis, MN 55401

Emma Freeman
 *Counsel of Record*
APOLLO LAW LLC
1000 Dean Street
Suite 101
emma@apollo-law.com
(646) 363-6766

[*additional counsel listed on inside cover*]

Michael J. DeBenedictis
Efthimios Parasidis
DEBENEDICTIS & DEBENEDICTIS LLC
1415 Route 70 East
Suite 103
Cherry Hill, NJ 08034

**U.S. COURT OF APPEALS FOR THE ELEVENTH CIRCUIT**

**CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT (CIP)**

_____ *vs.* _____ Appeal No. _____

11th Cir. R. 26.1-1(a) (enclosed) requires the appellant or petitioner to file a Certificate of Interested Persons and Corporate Disclosure Statement (CIP) with this court within 14 days after the date the case or appeal is docketed in this court, and to include a CIP within every motion, petition, brief, answer, response, and reply filed. Also, all appellees, intervenors, respondents, and all other parties to the case or appeal must file a CIP within 28 days after the date the case or appeal is docketed in this court. **You may use this form to fulfill these requirements.** In alphabetical order, with one name per line, please list all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party.

***(please type or print legibly)*:**

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Rev.: 12/16

**Hernandez, et al. v. Florida Board of Bar Examiners, et al., No. 24-13543**

**CERTIFICATE OF INTERESTED PERSONS ADDENDUM**

Apollo Law, LLC

Dean, James Joseph

Drwencke, David

Florida Board of Bar Examiners

Freeman, Emma

Gavagni, Michele A.

Hansen, Adam W.

Hernandez, Steven W.

McNeely, Robert Andrew

Messer Caparello, P.A.

Pafford, William

Parasidis, Efthimios

**Emma Freeman, Counsel for Appellants, certifies that (1) no publicly traded company or corporation has an interest in the outcome of this appeal and (2) this Certificate of Interested Persons is complete to the best of Counsel's knowledge.**

November 13, 2024

_____
Emma Freeman
Counsel for Appellants

ii

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Appellants respectfully request oral argument in this case, which presents important issues related to the scope of the dormant Commerce Clause's prohibitions, the distinctions between facial discrimination and discrimination in practical effect, and the nature of out-of-state economic interests. Oral argument will give this Court a valuable opportunity to ask questions about the record and clarify the parties' arguments.

## <u>TABLE OF CONTENTS</u>

CERTIFICATE OF INTERESTED PERSONS ..........................................i

STATEMENT IN SUPPORT OF ORAL ARGUMENT ..........................iii

TABLE OF CONTENTS ............................................................................iv

TABLE OF AUTHORITIES ..................................................................viii

STATEMENT OF JURISDICTION .......................................................... 1

STATEMENT OF THE ISSUES ................................................................ 2

INTRODUCTION ....................................................................................... 3

STATEMENT OF THE CASE ................................................................... 7

I.    FACTUAL BACKGROUND ............................................................ 7

    A.    The Florida Board of Bar Examiners ..................................... 7

    B.    The Board Enacts Rule 2-23.4, Which Imposes Outsized
        Bar Exam and Admission Fees on Experienced
        Attorneys with Out-of-State Licenses ................................... 9

        (1)    The Board claims that Rule 2-23.4 fees fund
            background check costs, but the revenue
            generated far exceeds those costs ................................ 10

        (2)    The Board admits that Rule 2-23.4 revenue
            actually subsidizes discount application fees for
            Floridians ................................................................... 12

    C.    Rule 2-23.4 Dissuades Drwencke from Applying to the
        Florida Bar ........................................................................... 12

    D.    Rule 2-23.4 Forces Hernandez to Pay a $3,000
        Admission Fee ...................................................................... 13

    E.    Florida Is the Only State that Imposes Excessive Bar
        Exam and Admission Fees on Experienced Attorneys
        with Out-of-State Licenses ................................................... 14

II.  PROCEDURAL HISTORY ............................................................... 15

    A.  The District Court Dismisses the First Amended Complaint ........................................................................ 15

    B.  The District Court Grants Leave to Amend the Dormant Commerce Clause Claim Only .............................................. 16

    C.  The District Court Dismisses the Facial-Discrimination Commerce Clause Claim but Allows the Practical-Effects Claim to Proceed ...................................................... 16

    D.  The District Court Denies Hernandez's and Drwencke's Motion for Partial Summary Judgment and Grants the Board's Motion for Partial Summary-Judgment .................. 17

SUMMARY OF THE ARGUMENT ...................................................... 18

STANDARD OF REVIEW .................................................................. 20

ARGUMENT ....................................................................................... 20

I.  RULE 2-23.4 VIOLATES THE DORMANT COMMERCE CLAUSE ......................................................................................... 20

    A.  The Dormant Commerce Clause Prohibits Taxing Out-of-State Interests to Benefit In-State Interests ................... 21

    B.  Rule 2-23.4 Facially Discriminates Against Experienced Attorneys with Out-of-State Law Licenses .......................... 23

        (1)  The Rule facially discriminates against interstate commerce by imposing heightened fees *only* on experienced attorneys licensed out-of-state ................ 24

        (2)  Reasonable, nondiscriminatory alternatives could serve the Board's interest in funding discounted admission fees ......................................................... 31

    C.  The Rule Discriminates Against Interstate Commerce in Practical Effect ...................................................................... 33

(1)    State laws discriminate in "practical effect" when they favor in-state interests at the expense of out-of-state interests ........................................................ 33

(2)    Rule 2-23.4 forces all experienced attorneys with out-of-state licenses to pay a heightened "entrance fee" to the Florida legal marketplace ......................... 35

(3)    Rule 2-23.4 forces a class of predominantly out-of-state residents to pay a heightened "entrance fee" to the Florida legal marketplace................................. 35

    (a)    *Hernandez* and *Drwencke* need not show "exclusion from the market"* ............................... 36

    (b)    *Rule 2-23.4 disproportionately imposes costs on out-of-state residents* ..................................... 38

    (c)    *The Board concedes that Rule 2-23.4 was motivated by protectionism* ................................ 43

II.    THE BOARD AND GAVAGNI ARE NOT IMMUNE FROM HERNANDEZ'S DAMAGES CLAIMS ......................................... 46

    A.    The Board Is Not Entitled to Eleventh Amendment Immunity.......................................................................... 46

        (1)    The Rules of the Florida Supreme Court define the Board as an independent agency ................................. 47

        (2)    The Florida Supreme Court exercises little control over the Board ............................................................. 48

        (3)    The Board derives its funds exclusively from applicant fees ............................................................ 49

        (4)    The Board is exclusively responsible for money judgments against it ................................................. 50

    B.    Gavagni Is Not Entitled to Qualified Immunity ................. 54

CONCLUSION ....................................................................... 57

vi

CERTIFICATE OF SERVICE...................................................................

CERTIFICATE OF COMPLIANCE...........................................................

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Abusaid v. Hillsborough Cnty. Bd. of Cnty. Comm'rs.*,
  405 F.3d 1298 (11th Cir. 2005) ....................................................... 50

*Am. Trucking Ass'ns, Inc. v. Scheiner*,
  483 U.S. 266 (1987) ........................................................................ 39

*Auer v. Robbins*,
  519 U.S. 452 (1997) ........................................................................ 53

*Bainbridge v. Turner*,
  311 F.3d 1104 (11th Cir. 2002) ...................................................... 21

*Best & Co. v. Maxwell*,
  311 U.S. 454 (1940) ........................................................................ 57

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*,
  476 U.S. 573 (1986) .................................................... 22-23, 38, 43

*C & A Carbone, Inc. v. Clarkstown, N.Y.*,
  511 U.S. 383 (1994) .............................................. 22, 24, 33, 40, 55

*Cachia v. Islamorada*,
  542 F.3d 839 (11th Cir. 2008) ...................................................... 42

*Camps Newfound/Owatonna, Inc. v. Town of Harrison*,
  520 U.S. 564 (1997) ........................................................... 40, 42–43

*Carr v. City of Florence, Ala.*,
  504 U.S. 334 (1992) ................................................................. 52–53

*Chem. Waste Mgmt. v. Hunt*,
  504 U.S. 334 (1992) .............................................. 22–23, 32, 35, 37

*Dean Milk Co. v. City of Madison, Wis.*,
  340 U.S. 349 (1951) ................................................................. 33, 40

*Dep't of Revenue v. Kuhnlein,*
 646 So.2d 717 (1994) ........................................................ 29–30, 47

*Diaz v. Moore,*
 861 F. Supp. 1041 (N.D. Fla. 1994)................................................ 53

*Dillard v. City of Greensboro,*
 213 F.3d 1347 (11th Cir. 2000) ..................................................... 44

*Edelman v. Jordan,*
 415 U.S. 651 (1974) ......................................................................... 50

*Florida Bar re Advisory Op.—Out-of-State Attorney Working Remotely from Florida Home,*
 318 So.3d 538 (2021) ............................................................... 27–28

*Fla. Transp. Servs., Inc. v. Miami-Dade Cnty.,*
 703 F.3d 1230 (11th Cir. 2012) ..................................... 6, 22–23, 26

*Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Nat'l Res.,*
 504 U.S. 353 (1992) ......................................................................... 40

*Fouche v. Jekyll Island-State Park Auth.,*
 713 F.2d 1518 (11th Cir. 1983) ..................................................... 52

*Fresenius Med. Care Holdings, Inc. v. Tucker,*
 704 F.3d 935 (11th Cir. 2013) ....................................................... 35

*Fulton Corp. v. Faulkner,*
 516 U.S. 325 (1996) ......................................................................... 41

*Goldfarb v. Va. State Bar,*
 421 U.S. 773 (1975) ......................................................................... 24

*Guy v. Baltimore,*
 100 U.S. 434 (1879) .................................................................... 7, 30

*Hobbs v. Fla. Bd. of Bar Exam'rs,*
 No. 17-cv-422, 2018 WL 5905467 (N.D. Fla. June 16, 2018) ........ 53

*Hope v. Pelzer,*
 536 U.S. 730 (2002) ........................................................................ 54

*Hughes v. Okla.,*
 441 U.S. 322 (1979) ................................................................. 31–32

*Hunt v. Wa. State Apple Advert. Comm'n,*
 432 U.S. 333 (1977) ............................................... 22, 33, 37, 45–46

*Island Silver & Spice, Inc. v. Islamorada,*
 542 F.3d 844 (11th Cir. 2008) ...................................................... 36

*Jackson v. Ga. Dep't of Transp.,*
 16 F.3d 1573 (11th Cir. 1994) ................................................. 50–52

*Jagnandan v. Giles,*
 538 F.2d 1166 (5th Cir. 1976) ...................................................... 53

*Lake v. Skelton,*
 840 F.3d 1334 (11th Cir. 2016) ................................................... 46

*Locke v. Shore,*
 634 F.3d 1185 (11th Cir. 2011) ....................... 17, 34–36, 38, 43, 45

*Mallory v. Norfolk S. Ry. Co.,*
 600 U.S. 122 (2023) ...................................................................... 34

*Manders v. Lee,*
 338 F.3d 1304 (11th Cir. 2003) (en banc) ............. 19, 46–48, 50, 53

*Md. v. La.,*
 451 U.S. 725 (1981) ...................................................................... 41

*Mesa Valderrama v. U.S.,*
 5417 F.3d 1189 (11th Cir. 2005) .................................................. 20

*Miccosukee Tribe of Indians of Fla. v. Fla. St. Athletic Comm'n.*,
226 F.3d 1226 (11th Cir. 2000) ...................................................... 49

*Misener Marine Constr., Inc. v. Norfolk Dredging Co.*,
No. 404-cv-146, 2005 WL 8156248 (S.D. Ga. Dec. 14, 2005)......... 48

*Mueller v. Fla. Bar*,
390 So.2d 449 (Fl. 4th DCA 1980)................................................. 53

*Nat'l Pork Prods. Council v. Ross*,
598 U.S. 356 (2023) ................................................................. 3, 21

*New Energy Co. of Ind. v. Limbach*,
486 U.S. 269 (1988) ...................................................................... 41

*Okla. Tax Comm'n v. Jefferson Lines, Inc.*,
514 U.S. 175 (1995) ...................................................................... 21

*Or. Waste Sys., Inc. v. Dep't of Env. Quality of the State of Or.*,
511 U.S. 93 (1994) ...........................18, 22, 24–27, 29, 32, 44, 54–56

*Pellitteri v. Prine*,
776 F.3d 777 (11th Cir. 2015) ....................................................... 51

*Philadelphia v. N.J.*,
437 U.S. 617 (1978) ...................................................................... 23

*Pike v. Bruce Church, Inc.*,
397 U.S. 137 (1970) ...................................................................... 42

*Ramos v. Tomasino*,
701 F. App'x 798 (11th Cir. 2017) ................................................. 53

*Regents of the Univ. of Ca. v. Doe*,
519 U.S. 425 (1997) ...................................................................... 50

*Sea Servs. of the Keys v. State of Fla.*,
156 F.3d 1151 (11th Cir. 1998) ..................................................... 52

*Shotz v. Cates,*
 256 F.3d 1077 (11th Cir. 2001) .................................................... 20

*Stanton v. Sims,*
 571 U.S. 3 (2013) ................................................................... 54–55

*Stoddard v. Fla. Bd. of Bar Exam'rs,*
 509 F. Supp. 2d 1117 (N.D. Fl. 2006) ............................................ 54

*Sutton v. Wal-Mart Stores East, LP,*
 674 F.4th 1166 (11th Cir. 2023) ................................................... 20

*Tolchin v. Sup. Ct. of the State of N.J.,*
 111 F.3d 1099 (3d Cir. 1997) ....................................................... 41

*Travelers Indem. Co. v. Sch. Bd. of Dade Cnty., Fla.,*
 666 F.2d 505 (11th Cir. 1982) ........................................... 48–50, 52

*U.S. v. Iona-Dejesus,*
 No. 22-cv-20473, 2023 WL 3980082 (S.D. Fl. May 4, 2023) .......... 28

*U.S. v. Lanier,*
 520 U.S. 259 (1997) ................................................................... 55

*W. Lynn Creamery, Inc. v. Healy,*
 512 U.S. 186 (1994) .............................................................. 30, 56

*Wyo. v. Okla.,*
 502 U.S. 437 (1992) ................................................................... 35

## CONSTITUTIONAL PROVISIONS

Art. I, Section 8, Cl. 3 of the United States Constitution .............. 1, 3, 21

## RULES

Rule of the Sup. Ct. of Fla. Relating to Admissions to the Bar ("Rules")
1-13 ...................................................................................... 8

Rule 1-21 ................................................................................. 8

Rule 1-50.................................................................................8

Rule 1-51.................................................................................8

Rule 1-51.1..............................................................................8

Rule 1-51.2..............................................................................8

Rule 1-52.................................................................................8

Rule 1-53.................................................................................8

Rule 2-23.................................................................................9

Rule 2-23.1..............................................................................9

Rule 2-23.2..............................................................................9

Rule 2-23.3..............................................................................9

Rule 2-23.4................................................4, 9–10, 12–13, 18, 23, 28

Fla. R. Jud. Admin. 2.440(a)(1)...........................................47

## STATEMENT OF JURISDICTION

The district court had federal-question jurisdiction under 28 U.S.C. § 1331 because this case arises under Article I, Section 8, clause 3 of the United States Constitution. Doc 1 – Pg 22.[1]

This Court has jurisdiction over this appeal under 28 U.S.C. § 1291. The district court entered final judgment on September 30, 2024. Doc 110 – Pg 1. Appellants filed a notice of appeal on October 28, 2024. Doc 111 – Pgs 1-3. This appeal is from a final judgment disposing of all parties' claims.

---

[1] This brief cites references to the record using the page number that appears in the header generated by the district court's electronic filing system. *See* 11th Cir. R. 28-5.

1

## STATEMENT OF THE ISSUES

1.     Did the district court err when it dismissed the facial-discrimination dormant Commerce Clause claim based on its (i) misreading of Supreme Court precedent and (ii) failure to recognize that the challenged bad admission fee policy explicitly charged elevated fees *only* to experienced attorneys with out-of-state law licenses?

2.     Did the district court err when it denied Hernandez's and Drwencke's motion for partial summary judgment on the practical-effect discrimination claim under the dormant Commerce Clause despite statistical evidence showing that the challenged fee policy disproportionately burdens out-of-state residents yet benefits Florida residents almost exclusively?

3.     Did the district court err when it concluded that the Florida Board of Bar Examiners was an arm of the state for purposes of Eleventh Amendment immunity, even though the Board is fiscally independent and any money judgment against it would not be paid from state funds?

4.     Did the district court err when it held that Michele Gavagni was entitled to qualified immunity on Hernandez's damages claims despite precedent clearly establishing his right to be free from punitive fees, imposed solely because he possesses an out-of-state item of commerce (a law license)?

## INTRODUCTION

The dormant Commerce Clause—a "negative" aspect of Article I, Section 8, Clause 3 of the Constitution—prohibits states from "discriminat[ing] purposefully against out-of-state economic interests." *Nat'l Pork Prods. Council v. Ross*, 598 U.S. 356, 364 (2023). This case is about whether, consistent with the dormant Commerce Clause, Defendant-Appellee the Florida Board of Bar Examiners may impose a dramatically heightened bar-admission fee on experienced applicants who are licensed in another jurisdiction to fund discounted admission fees for applicants—overwhelmingly Florida residents—who have no such out-of-state licenses. It may not.

*** 

Every one of the fifty states generally requires people who have graduated from law school to pass a bar examination before earning a license to practice law in that jurisdiction. To sit for a bar exam, applicants must pay an admission fee, which varies from state to state and serves to defray exam and administrative costs. Most states, through an entity that administers the bar exam, charge flat fees to every single applicant. Others charge one fee for the exam itself and another for a background check. These fee policies do not offend the Constitution.

But the Florida Board of Bar Examiners (the "Board") has fashioned a bar exam fee policy that stands alone in this country—one that the dormant Commerce Clause forbids. Pursuant to the Florida

Rules of the Supreme Court Relating to Admissions to the Bar,[2] the Board charges a variable fee depending on whether—and for how long—an applicant has been licensed outside of Florida—functionally taxing attorneys barred in other states. New attorneys—a group the Board defines to include law students and attorneys licensed for less than one year—pay anywhere from $700 to $1,000, depending on whether they are still in law school and whether they meet certain early-registration deadlines. But experienced attorneys—defined as those who have been licensed in other states for at least one year—owe a much greater fee, one that increases depending on how long the applicant has been barred in another jurisdiction. Under Rule 2-23.4 (the "Rule"), "experienced attorney" applicants pay between $1,600 and $3,000 for the privilege of merely *attempting* to pass the Florida bar exam—as much as three times what a new-attorney applicant might pay.

It is no accident that the Board imposes far greater fees on experienced-attorney applicants who are licensed out-of-state. The Board has admitted that it uses the revenue from the enhanced experienced-attorney fee to fund discounts for new attorney-applicants, nearly 87 percent of whom live *in Florida*. In other words, the Board designed a fee structure that deliberately forces a group of applicants who predominantly live out-of-state—and who *all* have out-of-state business

---

[2] *Available at* https://www.floridabarexam.org/web/website.nsf/rule.xsp (last accessed January 23, 2025).

interests—to subsidize lower fees for a group of applicants who virtually all live and practice in Florida. This is rank protectionism—a bold and deliberate effort by the Board to squeeze money from out-of-staters and use it to foot the bill for in-state perks. No other state forces experienced applicants barred out-of-state to pay an admissions fee that is more *than three times greater* than the fee other applicants pay. And no other state charges experienced, out-of-state-licensed applicants a fee that is grossly disproportionate to the actual cost of evaluating those applicants.

Plaintiffs-Appellants Steven Hernandez, a New Jersey-licensed attorney who paid $3,000 to take the Florida bar exam, and David Drwencke, an Illinois-licensed attorney who was dissuaded from taking the Florida bar exam because of the elevated fees he would have owed, together challenged the constitutionality of Rule 2-23.4 under the dormant Commerce Clause.

Hernandez and Drwencke now appeal from the district court's adverse judgment, highlighting interrelated errors. *First*, based on a misreading of seminal Supreme Court precedent, the district court dismissed Hernandez's and Drwencke's claim that Rule 2-23.4 facially discriminates against interstate commerce. *Second*, the district court dismissed Hernandez's damages claims on the grounds that the Board was entitled to Eleventh Amendment immunity and Gavagni to qualified immunity. *Third*, and finally, the district court denied Hernandez's and

Drwencke's motion for partial summary judgment on their claim that the Rule discriminated against interstate commerce in "practical effect."

Each of these conclusions was wrong.

Rule 2-23.4 facially discriminates against out-of-state economic interests: its plain text singles out experienced-attorney applicants with out-of-state licenses and charges them a heightened fee. There is no escaping that the Rule explicitly distinguishes between applicants who are licensed in jurisdictions other than Florida and those who are not. Laws that draw such obvious geographic distinctions survive only if the state has "*no other means*" to serve its interests. *Fla. Transp. Servs., Inc. v. Miami-Dade Cnty.*, 703 F.3d 1230, 1244 (11th Cir. 2012) (emphasis added). The Board can't remotely meet this "rigorous scrutiny." *Id.* It concedes that many alternative, nondiscriminatory fee arrangements could fund discounts for new-attorney applicants.

Rule 2-23.4 also discriminates in practical effect against out-of-state residents. The impact of the Rule is not subtle: it forces a group of attorneys who predominantly live and practice out-of-state to subsidize discounts for a group of attorneys who are *overwhelmingly* Floridian. Protectionism is rarely so obvious. The district court fixated on the fact that *some* Floridian applicants pay the heightened fee while *some* out-of-staters receive discounts. But that is not the test. Practical-effects discrimination does not require perfect mathematical precision. The Rule's impact—burdening predominantly out-of-state interests while

6

favoring in-state interests nearly exclusively—is sufficiently disproportionate to violate the Commerce Clause.

When it comes to money damages, the Board and Gavagni are not immune, contrary to the district court's conclusion. The Board is not an arm of the state because it is exclusively responsible for money judgments against it, and Eleventh Amendment immunity only applies where state funds *must* be used to satisfy a judgment. And as for qualified immunity for Gavagni, the Supreme Court clearly established the key principle in this case—that states may not impose heightened fees on out-of-state items of commerce to fund in-state needs—more than three decades ago.

It has been the law for nearly 150 years that a state may not "build up its domestic commerce by means of unequal and oppressive burdens upon the industry and business of other States." *Guy v. City of Baltimore*, 100 U.S. 434, 443 (1879). By imposing sky-high fees on bar applicants licensed outside Florida to subsidize financial breaks for in-state applicants, that is exactly what the Board has done. This Court should reverse.

## STATEMENT OF THE CASE

## I.    FACTUAL BACKGROUND.

### A.    The Florida Board of Bar Examiners.

The Florida Board of Bar Examiners is an independent administrative agency of the Supreme Court of Florida consisting of twelve Florida Bar members and three public members who are not

7

lawyers. *See* Rules of the Supreme Court Relating to Admissions to the Bar 1-13, 1-21 ("Rules"); Doc 107 – Pg 6. The Florida Supreme Court created the Board "to implement the rules relating to bar admission." Rule 1-13; Doc 107 – Pg 6.

The Board, whose Executive Director is Defendant-Appellee Michele Gavagni, Doc 107 – Pgs 17-18, is an independent fiscal authority, Doc 107 – Pg 22; Rule 1-50. The Board prepares its own annual budget— separate from that of the Supreme Court and the state—and establishes bar exam and admission fees. Doc 107 – Pg 22; Rules 1-51, 1-51.1. The Board uses its own funds to compensate employees and pay expenses. Doc 107 – Pg 22; Rules 1-51.2, 1-53. The Board also bonds its own employees, taking responsibility for any possible misconduct. Rule 1-53. Beyond approving the Board's annual budget and bar admission fees, the Florida Supreme Court exercises no day-to-day control over the Board's activities. Doc 107 – Pg 23; Rule 1-51.

The Board's only source of revenue is bar applicant fees. Doc 107 – Pg 22; Rule 1-51.1. From those fees, which it maintains in a private bank, the Board is responsible for satisfying its own financial obligations. Doc 107 – Pgs 22-23; Rule 1-52. The Board maintains an excess-fee account more than ample enough to cover refund awards, Doc 30 – Pgs 32, 33 n.5, and does not—and may not—use any state funds to cover its own operations or liabilities, Rule 1-52; Doc 14-1 – Pg 19. Nor does the Board

8

have any right to indemnification from the Supreme Court or the state of Florida. Doc 107 – Pg 23.

**B.    The Board Enacts Rule 2-23.4, Which Imposes Outsized Bar Exam and Admission Fees on Experienced Attorneys with Out-of-State Licenses.**

The Board enacted Rule 2-23—which sets forth the fee schedule for Florida bar applicants at issue in this appeal—in 1996. The Rule creates two categories of applicants: those who have previously been admitted to the bar in any jurisdiction for more than twelve months ("experienced attorneys") and those who have not ("new attorneys"). Different components of Rule 2-23 address each category.

Rules 2-23.1 and 2-23.2 govern fees for new-attorney applicants. New attorneys pay different application fees depending on when they file for admission. New-attorney applicants who apply while still in law school pay a fee of $1000. Rules 2-23.1; 2-23.3. If new-attorney applicants who are still in law school apply by certain deadlines, they are eligible for "discounted early registration fees" of between $700 and $950. Rules 2-23.1(a)-(b); 2-23.3. New-attorney applicants who have already graduated from law school must pay an application fee of $1000. Rule 2-23.2.

Nearly 87 percent of new-attorney applicants are Florida residents. Doc 98-1 – Pg 3; Doc 68 – Pg 8; Doc 69-4 – Pgs 1-283.

Rule 2-23.4—the core of this appeal—governs fees for experienced attorneys. This Rule imposes progressively higher fees on experienced attorneys based on the number of years these attorneys have been

9

licensed to practice law "in another jurisdiction," Rule 2-23.4(a)-(d)—that is, a state or territory other than Florida. Experienced attorneys with more than one but less than 5 years of experience pay $1600. Rule 2-23.4(a). Those with between 5 and 10 years of experience pay $2000. Rule 2-23.4(b). Those with between 10 and 15 years of experience pay $2400, Rule 2-23.4(c), and those with 15 or more years of experience must pay $3000, Rule 2-23.4(d).

| Number of Years Admitted in a Non-Florida Jurisdiction | Bar Exam/Application Fee |
|---|---|
| Between 1 and 5 years | $1,600 |
| Between 5 and 10 years | $2,000 |
| Between 10 and 15 years | $2,400 |
| 15 or more years | $3000 |

These escalating fees apply *only* to attorneys who are or were licensed to practice law outside Florida. Rule 2-23.4 ("Applicants…must file…a fee based on the number of years the applicant has been admitted *in another jurisdiction*….") (emphasis added).

Over 55 percent of experienced-attorney applicants live outside of Florida. Doc 98-1 – Pg 3; Doc 68 – Pg 8; Doc 69-4 – Pgs 1-283.

> **(1)   The Board claims that Rule 2-23.4 fees fund background check costs, but the revenue generated far exceeds those costs.**

When the Board proposed Rule 2-23.4 to the Florida Supreme Court in 1995, it claimed that the additional revenue generated by the Rule

would account for the fact that "the cost of the Board's background investigation for out-of-state attorneys often increases in relationship to the number of years such attorneys have been admitted in their respective, foreign jurisdictions." Doc 80-2 – Pg 27. The Board cited no other justification for the Rule. Doc 80-2 – Pgs 1-51.

The Board's financial records, however, reveal that the background-check-cost rationale was just a façade: Rule 2-23.4 revenue grossly exceeds whatever marginally greater amount the Board must spend to investigate experienced bar applicants.

Board records from 2014-2015 provide a representative sample. The prior year, 482 experienced attorneys applied for the Florida bar and paid elevated fees under Rule 2-23.4, yielding $1,034,204 in Board revenue. Doc 107-1 – Pg 19. But the total cost of *all* background investigations in 2014-2015—for both new and experienced applicants—was just $643,000. *See* Doc 107-1 – Pg 22 (sum of salaries for Board investigators). And since the Board conducted 3,866 total background investigations in 2013-2014, Doc 107-1 – Pg 13, the 482 experienced-attorney applicants constituted a mere 12.4 percent of the total background-check pool.

The punchline: However much additional money the Board must spend to conduct experienced-attorney background checks, that amount pales in comparison to the revenue Rule 2-23.4 actually generates.

11

**(2)    The Board admits that Rule 2-23.4 revenue subsidizes discount application fees for Floridians.**

The reason for the tremendous disparity between Rule 2-23.4 revenue and the cost of experienced-attorney background checks became clear only midway through this litigation, when the Board confessed to a *second* purpose behind the Rule: "using revenue from the [experienced] attorney fee to provide 'early registration discounts to law students' and reduced application fees for newly licensed lawyers." Doc 45 – Pg 20 (quoting Doc 23 – Pgs 22-23). The Board did not ever disclose this rationale to the Supreme Court of Florida. *See* Doc 80-2 – Pgs 1-51.

This additional justification exposes the relationship between the different components of Rule 2-23. The Board offers new-attorney applicants—who are overwhelmingly Florida residents—reduced fees by substantially upcharging experienced-attorney applicants with out-of-state licenses, a group that predominantly resides out-of-state. At most, new-attorney applicants pay just $1000 (three times less than what the most experienced out-of-state-licensed applicants owe).

**C.    Rule 2-23.4 Dissuades Drwencke from Applying to the Florida Bar.**

Plaintiff-Appellant David Drwencke lives in Chicago and practices law in Illinois, where he was admitted in 2017. Doc 107 – Pg 10. He is also licensed to practice in Michigan as of 2016 and the District of Columbia as of 2018. Doc 107 – Pg 10. Because he has family in Florida, Drwencke decided to apply to the Florida bar in 2021. Doc 107 – Pg 11.

12

Based on his various bar admissions, Drwencke was subjected to the $2,000 Rule 2-23.4 fee for attorneys with between 5 and 10 years of out-of-state experience. Rule 2-23.4(b); Doc 107 – Pg 11.

Drwencke intended to take the Florida bar exam in August 2021. Doc 107 – Pg 11. But when he learned about the Board's escalating, enhanced fee schedule for experienced attorneys, Drwencke was dissuaded from submitting his application. Doc 107 – Pg 11. If not for the Rule, Drwencke would already have submitted his application. Doc 107 – Pg 12. Instead, he has been forced to keep his personal and professional plans on hold pending the resolution of this case, and risks incurring yet greater fees if he enters the next experience category. Doc 107 – Pg 12.

### D. Rule 2-23.4 Forces Hernandez to Pay a $3,000 Admission Fee.

Plaintiff-Appellant Steven Hernandez lives and practices law in New Jersey, where he became licensed in 2004 and owns The Hernandez Law Firm, P.C. Doc 107 – Pg 13. In 2020, Hernandez decided to move his legal practice from New Jersey to Florida. Doc 107 – Pg 14.

Like Drwencke, Hernandez was surprised to learn that Rule 2-23.4 required him to pay $3,000 merely to sit for the Florida bar examination. Doc 107 – Pg 14. Hernandez paid the $3,000 fee, but has deferred his application for admission pending the outcome of this litigation, each time incurring an additional charge. Doc 107 – Pg 15-16.

13

**E.    Florida Is the Only State that Imposes Excessive Bar Exam and Admission Fees on Experienced Attorneys with Out-of-State Licenses.**

Florida is the only state that imposes drastically heightened fees on experienced bar applicants who already hold out-of-state law licenses.

Most states use a flat fee structure to implement their bar exams—charging the same amount to applicants regardless of (1) whether they are licensed in another state and (2) how long they have held any such license. Doc 107 – Pg 32; *see, e.g.*, https://bit.ly/4h3s0Os (New York: $250); https://bit.ly/4ax9SdC (Connecticut: $800); https://bit.ly/4gZeBHq (Colorado: $710). Others, including Maryland, assess one fee for the bar examination and another for background checks. Doc 107 – Pg 32. But again, these fees don't change based on the fact that an attorney is already licensed in another state. Still other jurisdictions give attorneys barred elsewhere the *option* to pay a voluntary fee to be admitted "on motion" or through reciprocity—that is, without sitting for the bar exam. *See* Doc 107 – Pg 32; https://www.njbarexams.org/appinfo.action?id=12 (New Jersey: $1,500).

The Board could adopt any of these constitutionally permissible approaches to fund its licensing operations and facilitate fee discounts. Instead, it chose to impose those costs onto a group of bar applicants who practice elsewhere and predominantly live outside Florida.

14

## II.    PROCEDURAL HISTORY.

On September 7, 2021, Hernandez and Drwencke filed the First Amended Complaint, a putative class action against the Board and Michele Gavagni. Doc 14 – Pgs 1-51. The complaint challenged Rule 2-23.4 under the dormant Commerce Clause, Doc 14 – Pg 30, as well as five other constitutional provisions not relevant to this appeal, Doc 14 – Pgs 36-45.

The Board moved to dismiss, Doc 23 – Pgs 1-37, arguing that the district court lacked subject matter jurisdiction based on Eleventh Amendment immunity and standing, Doc 23 – Pgs 29-36; that Rule 2-23.4 does not violate the dormant Commerce Clause, Doc 23 – Pgs 18-25; and that Gavagni was immune from damages, Doc 23 – Pgs 25-29.

### A.    The District Court Dismisses the First Amended Complaint.

The district court dismissed the First Amended Complaint. Doc 40 – Pgs 10-11.

First, the district court dismissed all of Drwencke's claims and Hernandez's declaratory and injunctive claims for lack of standing, but held that (1) Hernandez *did* have standing to seek damages "because his economic harm is traceable" to the Board, Doc 40 – Pg 6; (2) the Board was immune from damages claims under the Eleventh Amendment because it is an "arm of the state," Doc 40 – Pgs 6-9; and (3) qualified immunity barred Hernandez's damages claims against Gavagni in her personal capacity, Doc 40 – Pgs 9-10.

15

**B.   The District Court Grants Leave to Amend the Dormant Commerce Clause Claim.**

Plaintiffs sought leave to file a Second Amended Complaint, Doc 41 – Pgs 1-2. The district court held that the Second Amended Complaint— as pleaded—did not state a Commerce Clause claim under either of two theories: first, that Rule 2-23.4 facially discriminates against interstate commerce, and second, that the Rule discriminates against interstate commerce in "practical effect." Doc 45 – Pgs 1, 14-20. But district court *granted* the motion to amend, because "a complaint with additional facts perhaps could" state a Commerce Clause claim. Doc 45 – Pg 20.

Plaintiffs filed the Third Amended Complaint on July 21, 2022. Doc 46 – Pgs 1-77.

**C.   The District Court Dismisses the Facial-Discrimination Commerce Clause Claim But Allows the Practical-Effects Claim to Proceed.**

The district court denied the Board's motion to dismiss the Third Amended Complaint because "Plaintiffs have stated a plausible dormant Commerce Clause Claim." Doc 53 – Pg 2.

While the district court dismissed the facial-discrimination theory based on its erroneous application of Supreme Court precedent, it refused to dismiss the practical-effects claim based on a "plausible inference…that the fee deters non-Floridians from seeking bar admission or that it otherwise discriminates in effect" against interstate commerce. Doc 53 – Pgs 3-4.

16

At this point, the only remaining claim was the practical-effects discrimination claim under the Commerce Clause. Hernandez sought money damages from his payment of the enhanced fee, while Drwencke sought injunctive and declaratory relief against Rule 2-23.4.

### D. The District Court Denies Hernandez's and Drwencke's Motion for Partial Summary Judgment and Grants the Board's Motion for Partial Summary Judgment.

Following limited discovery, the district court denied Hernandez's and Drwencke's motion for partial summary judgment on the practical-effects discrimination claim under *Locke v. Shore*. Doc 95 – Pgs 9-13 (citing 634 F.3d 1185, 1193 (11th Cir. 2011)).

The district court held that the first *Locke* factor—whether the Rule "excludes a class of predominantly out-of-state residents from the market"—favored the Board, since "Drwencke points to no evidence that Rule 2-23.4 excludes any nonresidents from the Florida legal market." Doc 95 – Pg 11 (cleaned up). The district court held that the second factor—whether the regulation "imposes costs on out-of-state residents that in-state residents do not have to bear"—also favored the Board, because "both Florida residents and nonresidents pay higher fees under Rule 2-23.4." Doc 95 – Pgs 11-12. Finally, the district court held that the third factor—whether the Board was motivated by protectionism—favored the Board, since the use of Rule 2-23.4 revenue for background check costs suggested no "hostility to nonresidents." Doc 95 – Pgs 12-13.

17

For largely identical reasons, the district court granted the Board's motion for partial summary judgment on the practical-effects claim. Doc 103 – Pgs 2-10. In reaching these summary judgment conclusions, the district court erred in applying governing Supreme Court precedent.

Hernandez and Drwencke timely appealed. Doc 111 – Pgs 1-3.

## SUMMARY OF THE ARGUMENT

Rule 2-23.4, which imposes heightened Florida bar exam and admission fees on experienced attorneys with out-of-state law licenses, violates the dormant Commerce Clause because it discriminates (1) *facially* against applicants who hold out-of-state licenses and (2) *in practical effect* against lawyers who live and practice outside of Florida.

The Rule facially discriminates because it imposes an enhanced fee *only* on experienced attorneys barred out-of-state. By its plain text, the Rule targets attorneys who have been admitted "in any other jurisdiction" besides Florida for more than 12 months. Rule 2-23.4. Because an attorney's *business* (her law practice) exists in the state that issued her license—no matter where that attorney resides—the Rule financially punishes lawyers who are barred outside Florida and therefore practice law out-of-state. The Supreme Court has already held that the dormant Commerce Clause forbids an analogous Oregon statute that taxed the disposal of waste generated *outside* Oregon more heavily than waste generated in-state. *Or. Waste Sys., Inc. v. Dep't of Env. Quality of the State of Or.*, 511 U.S. 93, 98 (1994). Since numerous

18

nondiscriminatory methods could serve the Board's in-state interests, Rule 2-23.4 cannot withstand Commerce Clause scrutiny.

Rule 2-23.4 discriminates in practical effect against out-of-state residents under this Circuit's *Locke v. Shore* factors. First, Hernandez and Drwencke need not show exclusion from the market to show discrimination in practical effect. The Supreme Court has held time and again that states can—and often do—violate the Commerce Clause merely by imposing heightened fees on out-of-state economic interests, which the Rule does in spades. Second, even though the Rule does not target out-of-staters on its face, its impact is undeniable: while over 55 percent of experienced-attorney applicants who pay the enhanced fee live outside Florida, nearly 87 percent of new attorneys who receive fee discounts live *in* Florida. Third, Rule 2-23.4 is protectionist: the Board designed it to financially advantage a group of bar applicants who are nearly all Florida residents.

Neither the Board nor Gavagni is immune from Hernandez's damages claims. Under the four-factor test set forth in *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003) (en banc), the Board is not an arm of the state of Florida: it is an independent entity, funded entirely from applicant fees, over which the Florida Supreme Court exercises little control. And, crucially, any money judgment against the Board would come from Board revenue, *not* the state treasury. Nor is Gavagni entitled to qualified immunity. Hernandez's right to be free from punitive fees

19

that target him simply because he holds an out-of-state item of commerce—a law license—has been clearly established at least since the Supreme Court's 1994 decision in *Oregon Waste*.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's grant of a motion to dismiss for failure to state a claim, and must accept the allegations in the complaint as true and construe them in the light most favorable to the plaintiff, *Mesa Valderrama v. U.S.*, 417 F.3d 1189, 1194 (11th Cir. 2005). "[This Court] may only affirm the dismissal of the complaint if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Shotz v. Cates*, 256 F.3d 1077, 1079 (11th Cir. 2001) (cleaned up).

This Court reviews a district court's grant of summary judgment *de novo*. *Sutton v. Wal-Mart Stores East, LP*, 674 F.4th 1166, 1168 (11th Cir. 2023). Summary judgment is appropriate only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Id.*

## ARGUMENT

## I.  RULE 2-23.4 VIOLATES THE DORMANT COMMERCE CLAUSE.

Rule 2-23.4, which imposes elevated admission fees on experienced attorneys with out-of-state law licenses, discriminates against interstate commerce both on its face (by targeting *only* lawyers already licensed

20

outside of Florida) and in practical effect (by disproportionately burdening non-Florida residents to benefit Floridians). The district court erred in dismissing the facial-discrimination claim and, later, in denying plaintiffs' motion for summary judgment on the practical-effects claim.

## A. The Dormant Commerce Clause Prohibits Taxing Out-of-State Interests to Benefit In-State Interests.

The Commerce Clause—Article I, Section 8, clause 3 of the United States Constitution—"vests Congress with the power to 'regulate Commerce…among the Several States.'" *Nat'l Pork Prods.*, 598 U.S. at 364. The Supreme Court has "consistently held this language to contain a further, negative command, known as the dormant Commerce Clause, prohibiting certain state [economic regulations] even when Congress has failed to legislate on the subject." *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995). The Supreme Court recently reaffirmed the "antidiscrimination principle" that "lies at the very core of [its] dormant Commerce Clause jurisprudence": "no State may use its laws to discriminate purposefully against out-of-state economic interests." *Nat'l Pork Prods.*, 598 U.S. at 364.

"To determine whether a statutory scheme violates the dormant Commerce Clause, [this Court] employ[s] two tiers of analysis." *Bainbridge v. Turner*, 311 F.3d 1104, 1108 (11th Cir. 2002). Only the first tier is at issue in this appeal. A policy fails at tier one if it discriminates against interstate commerce *either* "directly" *or* in "practical effect."

21

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579, 583 (1986). Discrimination means "differential treatment of in-state and out-of-state interests that benefits the former and burdens the latter." *Oregon Waste*, 511 U.S. at 99. Put another way, states discriminate when their "local laws…discriminate against an article of commerce by reason of its origin…out of State." *C & A Carbone, Inc. v. Clarkstown, N.Y.*, 511 U.S. 383, 390 (1994). A discriminatory policy is "virtually *per se* invalid," *Oregon Waste*, 511 U.S. at 99, and "is typically struck down without further inquiry," *Chem. Waste Mgmt. v. Hunt,* 504 U.S. 334, 342 (1992). The only exception is "a narrow class of cases in which the municipality can demonstrate, under *rigorous scrutiny*, that it has *no other means* to advance a legitimate local interest." *Fla. Transp. Servs.*, 703 F.3d at 1244 (cleaned up) (emphasis added).

The Supreme Court has invoked the dormant Commerce Clause to invalidate a wide array of state policies, each implicating a different article of commerce or economic interest. For example, the Supreme Court rejected Oregon's attempt to impose a higher per-ton tax on the disposal of solid waste generated by out-of-state landfill operators than on waste generated by in-state facilities. *Oregon Waste*, 511 U.S. at 108; *see also Chem. Waste*, 504 U.S. at 346 (Alabama hazardous waste disposal fee imposed only on waste generated outside the state violated dormant Commerce Clause). It threw out a New York mandatory price schedule that forced other states selling liquor within its borders to

22

"surrender…competitive advantages." *Brown-Forman*, 476 U.S. at 580. And the Supreme Court struck down a North Carolina requirement that any container of apples shipped into the state display *only* a USDA grade, prohibiting Washington from utilizing its trusted state grade. *Hunt v. Wa. State Apple Advert. Comm'n*, 432 U.S. 333, 351-54 (1977).

In short, a law discriminates against interstate commerce when it "has the effect of favoring in-state economic interests," *Fla. Transp. Servs.*, 703 F.3d at 1244 (cleaned up), including when it "tax[es] a transaction…more heavily when it crosses state lines than when it occurs entirely within the state," *Chem. Waste*, 504 U.S. at 342. "The crucial inquiry…must be directed to determining whether [the challenged policy] is basically a protectionist measure." *Philadelphia v. N.J.*, 437 U.S. 617, 624 (1978).

## B. Rule 2-23.4 Facially Discriminates Against Experienced Attorneys with Out-of-State Law Licenses.

The core of this case is simple: Rule 2-23.4 discriminates on its face against experienced attorneys who hold law licenses from any state other than Florida. The plain text of the Rule singles out experienced attorneys who have been "admitted in another jurisdiction," then charges *only* those attorneys an elevated set of fees based on the number of years they have been licensed elsewhere. Rule 2-23.4. Because a law license is a textbook "economic interest"—a ticket used in interstate commerce to gain access to a particular state's legal market—and because various

23

nondiscriminatory alternatives could serve the Board's interest in funding discounted bar examination fees and background checks, the district court erred in dismissing the facial-discrimination claim.

> **(1)    The Rule facially discriminates against interstate commerce by imposing heightened fees *only* on experienced attorneys licensed out-of-state.**

The Commerce Clause prohibits "local laws that…discriminate against an article of commerce by reason of its origin…out of State." *C & A Carbone,* 511 U.S. at 390. That is exactly what Rule 2-23.4 does. By imposing a higher admissions cost on *only* those experienced attorneys who are licensed out-of-state, the Rule "discriminates against an article of commerce"—namely, a non-Florida law license[3]—"*by reason of* its origin…out of State." *Id.* (emphasis added). In other words, Rule 2-23.4 explicitly saddles the holders of out-of-state law licenses with increased admission fees solely because those licenses were not issued in Florida. That, the Constitution does not permit.

The Supreme Court has already struck down an analogous heightened fee under the dormant Commerce Clause in *Oregon Waste*, which involved surcharges that Oregon imposed on the disposal of solid waste in-state. *Oregon Waste*, 511 U.S. at 95. While Oregon imposed a

---

[3] Law licenses (and legal services provided pursuant to them) are quintessential "economic interests" that the Commerce Clause permits states to regulate. *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975) (noting that states' "interest…in regulating lawyers is especially great" and describing states' "broad power to establish standards for licensing practitioners").

24

$2.25 per-ton surcharge on the disposal of waste generated in other states, it levied only an $0.85 surcharge on waste generated *inside* Oregon. *Id.* The Supreme Court invalidated the out-of-state surcharge as facially discriminatory because "the differential charge favors shippers of Oregon waste over their counterparts handling waste generated in other states." *Id.* at 100. "In making that geographic distinction," the Court wrote, "the surcharge patently discriminates against interstate commerce." *Id.* The Supreme Court therefore applied the "virtually *per se* rule of invalidity" to the out-of-state surcharge, meaning the surcharge must "pass the strictest scrutiny." *Id.* at 101 (cleaned up). Oregon failed this test, since it "offered no legitimate reason to subject waste generated in other States to a discriminatory surcharge approximately three times as high as that imposed on waste generated in Oregon." *Id.*

The unconstitutional surcharge in *Oregon Waste* strongly resembles the Board's experienced-attorney fee. Just like Oregon's elevated surcharge, which targeted the disposal of *only* out-of-state waste, Rule 2-23.4 imposes higher fees on *only* experienced attorneys with out-of-state licenses. In *Oregon Waste*, the state discriminated by making a "geographic distinction" between waste generated in Oregon and waste generated elsewhere. *Oregon Waste*, 511 U.S. at 100. Here, the Rule discriminates by making a geographic distinction between law licenses issued in Florida and law licenses issued elsewhere. And Oregon imposed the elevated surcharge solely because the waste at issue wasn't

generated in-state. Similarly, the Rule requires higher admission fees of attorneys with out-of-state licenses simply because those licenses weren't issued in Florida. The governing principle is clear: states may not tax out-of-state economic interests (in *Oregon Waste*, out-of-state garbage, and here, out-of-state law licenses) in order to benefit in-state interests. And of course, "a law can be discriminatory even without explicitly distinguishing between in-staters and out-of-staters." *Fla. Transp. Servs.*, 703 F.3d at 1249.

The district court dismissed the facial-discrimination claim based on its incorrect conclusion that *Oregon Waste* does not control. The district court repeatedly sought to differentiate *Oregon Waste*, claiming that the Oregon surcharge (1) "explicitly distinguished out-of-state and in-state activity" and (2) "facially discriminate[d] based on the geographic origin of the regulated activity," whereas the fee policy "does not" do either. Doc 45 - Pg 16.

The district court got this wrong. To understand exactly where the district court went astray, consider each statement in turn. Contrary to the district court's implication, *both* the Oregon surcharge *and* Rule 2-23.4 "explicitly distinguish[] out-of-state and in-state activity." Doc 45 - Pg 16. In *Oregon Waste*, the "in-state activity" was the generation of waste within Oregon, while the "out-of-state activity" was the generation of waste *outside* Oregon. Oregon penalized the disposal of out-of-state garbage with a surcharge *three times* higher than the one imposed on the

26

disposal of Oregon garbage. Rule 2-23.4 draws precisely the same in-state vs. out-of-state distinction. Here, the "in-state activity" is the issuance of law licenses *in Florida*, while the "out-of-state activity" is the issuance of law licenses *anywhere else*. Like in *Oregon Waste*, which imposed higher fees on out-of-state waste, in Florida, only applicants with out-of-state legal experience must pay elevated fees to apply for admission to the Florida bar. Rule 2-23.4 is unconstitutional because it—unlike any other state's fee policy, Doc 107 – Pg 46—distinguishes between experienced attorneys *with* out-of-state law licenses and those *without* ones, charging the former group a hefty fee that far exceeds any additional background-check expense. *See* Doc 107-1 – Pgs 13, 19, 22.

The district court was also incorrect to suggest that Rule 2-23.4 does not "facially discriminate based on the geographic origin of the regulated activity (here, legal services)." Doc 45 – Pg 16. This misinterpretation flows from a false premise: that the "geographic origin" of a law practice is an attorney's physical location while she practices. Doc 45 – Pg 12 (noting that "the fee does not facially discriminate between an attorney who 'crosses state lines' and one who conducts his business 'entirely within the state'") (cleaned up). In fact, an attorney's practice is located in the state that issued her law license.

The Florida Supreme Court explained why this is so in *Florida Bar re Advisory Op.—Out-of-State Attorney Working Remotely from Florida Home*, 318 So.3d 538 (2021). *Working Remotely* involved an attorney who

was only licensed to practice law in New Jersey, but who worked remotely from his Florida home. *Id.* at 539-41. The Florida Supreme Court held that this scenario "d[id] not implicate the unlicensed practice of law in Florida" since "[a]ll indicia point to [the attorney's] practice of law as being in New Jersey, not Florida." *Id.* at 541. The Florida bar, the court went on, had "no interest that warrants regulating [the attorney's] practice for his out-of-state clients…simply because he has a private home in Florida." *Id.* "Using the attorney's physical presence in Florida as the definitive criteria is inappropriate." *Id.* (cleaned up).

This makes good sense. Geographically speaking, the practice of law occurs in the state that issued the attorney's license. An attorney with a Wyoming license practices law in Wyoming regardless of whether he works from his permanent residence in Utah, from a hotel in Hawaii while on vacation, or from his friend's condo in South Dakota while house-sitting. Any other approach would contravene the Florida Supreme Court's analysis and ignore the "post-pandemic realities of remote work." *U.S. v. Iona-Dejesus*, No. 22-cv-20473, 2023 WL 3980082, at *4 n.3 (S.D. Fl. May 4, 2023).

*Working Remotely* makes the district court's error clear. Rule 2-23.4 *does* "facially discriminate based on the geographic origin of the regulated activity." Doc 45 - Pg 16. Only experienced attorneys "admitted in another jurisdiction" pay elevated admission fees. Rule 2-23.4. That is

28

facial discrimination based on the geographic origin of an applicant's law license and, therefore, her law practice.

Another Florida Supreme Court decision further underscores the district court's error and confirms that *Oregon Waste* is squarely on-point. In *Department of Revenue v. Kuhnlein*, the Florida Supreme Court struck down under the dormant Commerce Clause a law imposing a "$295 impact fee on cars purchased or titled in other states that then are registered in Florida by persons having or establishing permanent residency [t]here." 646 So.2d 717, 719 (1994). Relying heavily on *Oregon Waste*, the Court found Florida's "differential treatment of in-state and out-of-state economic interests" dispositive. *Id.* at 724. "[T]here can be no question but that a burden is placed on some out-of-state economic interests," the Court reasoned, because "Florida has erected a financial barrier…that "unquestionably favors in-state interests over out-of-state interests." *Id.* Since there was "no rational reason why the legislature chose a tax as regressive as this one," Florida had been "exacting more than a just share against interstate interests," which the Commerce Clause forbids. *Id.*

The Board's experienced-attorney fee strongly resembles Florida's tax on out-of-state vehicles. Rule 2-23.4 punishes attorneys who chose to obtain non-Florida licenses before taking the Florida bar; the "impact fee" punished vehicle owners who bought cars before moving to Florida. Both *Kuhnlein* and this case involve a "financial barrier" imposed only on

people who hold out-of-state items of commerce: cars and law licenses. And both the "impact fee" and Rule 2-23.4 create a "substantial advantage" for in-state interests. *Kuhnlein*, 646 So.2d at 724. The $295 fee forces people who bought cars outside of Florida to foot the bill for Florida's "road maintenance and construction." *Id.* at 725. Likewise, Rule 2-23.4 revenue—generated exclusively by lawyers with out-of-state licenses—funds discount admission fees for a group of new attorneys who are nearly 90 percent Floridian.

"The paradigmatic…law discriminating against interstate commerce is the protective tariff or customs duty, which taxes goods imported from other States, but does not tax similar products produced in state." *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 193 (1994). While the Supreme Court has deemed such tariffs "patently unconstitutional," Rule 2-23.4 is one of many "state laws that aspire to reap some of the benefits of tariffs by other means." *Id.* A tariff taxes out-of-state goods and *only* out-of-state-goods. Likewise, the Rule taxes out-of-state law licenses and *only* those licenses. And both a tariff and the Rule are "expedient[s] or device[s] to…build up [the state's] domestic commerce by means of unequal and oppressive burdens upon the industry and business of other States." *Guy*, 100 U.S. at 443 (invalidating wharfage fees under Commerce Clause). By erecting barriers impeding attorneys with out-of-state licenses from practicing in Florida, the Board

30

privileges attorneys who have no such out-of-state business interests—attorneys who happen to be overwhelmingly Floridian.

The district court's erroneous dismissal of the facial-discrimination claim had important consequences for the rest of this litigation. It required plaintiffs to plead and prove their entire case on a practical-effects theory. And the district court's rejection of Hernandez's and Drwencke's argument that "an [economic] interest is defined independent of residency," Doc 103 – Pg 8, forced the case to be litigated over the question of *residency-based* discrimination. Of course, Rule 2-23.4 *does* discriminate against non-residents in practical effect. *See infra* Part I.C. But the district court's out-of-the-gate rejection of the facial-discrimination theory overlooked Hernandez's and Drwencke's well-pleaded allegations and ignored the plain text of the Rule, which explicitly singles out attorneys "admitted in another jurisdiction" for higher admission fees.

### (2) Reasonable, nondiscriminatory alternatives could serve the Board's interest in funding discounted admission fees.

Because the Rule discriminates on its face by overcharging only out-of-state-license holders, it is subject to the "strictest scrutiny of any purported legitimate local purpose and of the absence of nondiscriminatory alternatives." *Hughes v. Okla.*, 441 U.S. 322, 337 (1979) (striking down Oklahoma statute prohibiting the out-of-state transport of minnows for sale because it "overtly discriminates against

interstate commerce"). The Supreme Court has deemed this stringent standard a "virtually *per se* rule of invalidity," *Oregon Waste*, 511 U.S. at 101, since "facial discrimination by itself may be a fatal defect, regardless of the state's purpose," *Hughes*, 441 U.S. at 337. The Rule fails this test.

Hernandez and Drwencke alleged several reasonable, nondiscriminatory alternatives that could serve the Board's goals. Most states use a flat fee structure to implement their bar exams. Doc 107 – Pg 32. Florida could do this, too. Others, including Maryland, assess one fee for the bar examination and another for background checks. Doc 107 – Pg 32. So could Florida. Still others, like New Jersey, utilize admissions "on motion." *See* https://www.njbarexams.org/appinfo.action?id=12 (New Jersey: $1,500); Doc 107 – Pg 32. Florida could follow this path as well. There is no question—and the Board does not dispute—that any number of nondiscriminatory methods could sufficiently fund background checks and discount admission fees. The district court never held otherwise. *See generally* Doc 45 - Pgs 14-20; Doc 103 - Pg 10.

The Board is free to choose from many methods of funding bar admission fee discounts and background checks. But the Board is *not* free to adopt a method that vastly overcharges only experienced applicants with out-of-state licenses. The Supreme Court has repeatedly struck down such burdens on interstate commerce where nondiscriminatory alternatives exist. *See, e.g.*, *Chem. Waste*, 504 U.S. at 343-44 (noting that "[l]ess discriminatory alternatives...[we]re available to alleviate [the

32

state's] concern"); *Dean Milk Co. v. City of Madison, Wis.*, 340 U.S. 349, 354-55 (1951) (noting availability of "reasonable and adequate alternatives").

## C. Rule 2-23.4 Discriminates Against Interstate Commerce in Practical Effect.

The district court erred in denying Hernandez's and Drwencke's motion for partial summary judgment on the practical effects claim. Rule 2-23.4 imposes heightened admission fees *only* on experienced attorneys with out-of-state licenses—a group of applicants who disproportionately reside *outside* of Florida. The Board uses that revenue to fund discounted admission fees for law students and new attorneys, nearly ninety percent of whom reside *in* Florida. Put another way, the Board forces a predominantly out-of-state group of applicants to subsidize discounts for an overwhelmingly in-state group of applicants. Supreme Court precedent—and all three of the *Locke v. Shore* factors—make clear that this practice discriminates in practical effect.

### (1) State laws discriminate in "practical effect" when they favor in-state economic interests at the expense of out-of-state interests.

The Supreme Court has long recognized that a state law may discriminate against interstate commerce "in practical effect" even when it does "not in explicit terms seek to regulate interstate commerce." *C & A Carbone*, 511 U.S. at 394 (striking down ordinance that discriminated "by its practical effect and design"); *Hunt*, 432 U.S. at 250-51 (facially-

neutral North Carolina ordinance violated dormant Commerce Clause by burdening interstate sale of Washington apples). The Supreme Court has never established a fixed test to assess whether a state law discriminates in practical effect, instead utilizing fact-specific analyses to assess whether the challenged law "disadvantage[s] out-of-state [entities] to the benefit of in-state [ones]." *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 161 n.7 (2023).

In *Locke v. Shore*, which upheld a Florida statute requiring out-of-state interior designers to obtain in-state professional licenses, this Court identified "several factors" from Supreme Court cases "which guide [this Court] in determining whether a neutrally-worded state law has a discriminatory impact": whether the law (1) "excludes a class of predominantly out-of-state [residents] from a particular market"; (2) "imposes costs on out-of-state residents that in-state residents do not have to bear"; and (3) "was motivated by protectionist purposes," 634 F.3d at 1193 (cleaned up).

However, *Locke* did not purport to set forth an exhaustive list of factors the Supreme Court has used to assess practical effects, nor did it suggest that *any* of the three factors it identified would necessarily be relevant in every factual scenario implicating the Commerce Clause. *See id.* Indeed, just one year after *Locke*, this Court upheld a law alleged to discriminate against interstate commerce in practical effect without

34

mentioning or applying the *Locke* factors. *Fresenius Med. Care Holdings, Inc. v. Tucker*, 704 F.3d 935, 942-44 (11th Cir. 2013).

> **(2) Rule 2-23.4 forces all experienced attorneys with out-of-state licenses to pay a heightened "entrance fee" to the Florida legal marketplace.**

For all the reasons set forth *supra* in Part I.B, Rule 2-23.4 discriminates in practical effect against experienced attorneys with out-of-state licenses, because a state law that facially discriminates against a set of out-of-state economic interests *necessarily* discriminates in practical effect against that same set of interests. *See Wyo. v. Okla.*, 502 U.S. 437, 456 (1992) (state law discriminated both facially and in practical effect); *Chem. Waste Mgmt.*, 504 U.S. at 342 (same). By its plain text, Rule 2-23.4 imposes a higher admission fee on a specific and clearly-identified group—experienced applicants to the Florida bar who are licensed out-of-state. It is only logical that the Rule has a real-life discriminatory impact on precisely that group of applicants.

> **(3) Rule 2-23.4 forces a class of predominantly out-of-state residents to pay a heightened "entrance fee" to the Florida legal marketplace.**

The Rule also discriminates in practical effect because it overwhelmingly favors Florida residents and disfavors non-residents. All three *Locke v. Shore* factors—to the extent they apply here—favor Hernandez and Drwencke.

### (a)    Hernandez and Drwencke need not show "exclusion from the market."

The district court held that the first *Locke* factor—whether the challenged law "excludes a class of predominantly out-of-state residents from a particular market," Doc 95 – Pg 11 (cleaned up)—favored the Board. This conclusion misunderstood how *Locke* applies to the specific facts here. Hernandez and Drwencke don't need to show that Rule 2-23.4 completely "excludes" non-Floridian attorneys from the Florida legal market to prevail under the first factor—only that the Rule *taxes* those attorneys to benefit Floridians.

Here's why. Of course, the total exclusion of an out-of-state group from the market would implicate the Commerce Clause, and exclusion may be an appropriate test where the challenged policy functions like an on-off switch: either a market participant is able to enter the market, or it is not. For example, in *Island Silver & Spice, Inc. v. Islamorada*, this Court struck down an ordinance that permitted so-called "formula retail establishments"—that is, chain stores like Walgreens or Costco—to set up shop in the township of Islamorada *only if* the store did not exceed 2,000 square feet. 542 F.3d 844, 847-48 (11th Cir. 2008). But because the parties stipulated that no national chain could satisfy that requirement, "the ordinance[] effective[ly] eliminat[ed]…all new interstate chain retailers" and therefore discriminated against interstate commerce in practical effect. *Id*. The square-footage limitation functioned as a blanket ban on national chain stores in Islamorada.

36

But that's not the only way a state can discriminate in practical effect. Decades of Supreme Court precedent make clear that the notion of "market exclusion" simply does not apply where a state policy forces out-of-state entities to pay a heightened fee to participate. *Chemical Waste* demonstrates that market exclusion is not a prerequisite to discrimination in practical effect. In that case, the Supreme Court invalidated an ordinance imposing an additional fee on hazardous waste generated outside Alabama but disposed of in-state. 504 U.S. at 348. The Supreme Court invalidated this "burdensome tax[]" because it "discriminates…in practical effect." *Id.* at 342. The Court reached this conclusion even though hazardous waste generated outside Alabama was merely subject to a higher fee before entering the state and wasn't excluded from the Alabama disposal market entirely. Rule 2-23.4 operates similarly: although attorneys licensed in other jurisdictions aren't outright barred from the Florida legal market, they must pay a higher fee simply because they are already licensed elsewhere.

Similarly, in *Hunt*, the Supreme Court struck down a North Carolina statute prohibiting apples sold in-state from bearing any "grade other than the applicable U.S. grade or standard." 432 U.S. at 335. This rule barred Washington (then the nation's "largest producer of apples," *id.* at 336) from using its state-specific grade on apples sold in North Carolina, *id.* at 337-38. The Supreme Court struck down this prohibition—even though it also applied to North Carolina sellers—

37

because it "deprive[d] Washington sellers of the market premium that such apples would otherwise command." *Id.* at 352. No market exclusion occurred or was required. The list of similar cases goes on. *See, e.g.*, *Brown-Forman*, 476 U.S. at 578, 583 (striking down New York liquor distiller price regulation statute because the "practical effect of the law is to control liquor prices in other States"). In all of these cases, the concept of "exclusion" was so factually inapplicable that the Supreme Court did not even mention it, much less analyze it as a factor.

The district court therefore misapplied the first *Locke* factor given the specific circumstances of this case. Hernandez and Drwencke need not show exclusion from the market, and have handily demonstrated that Rule 2-23.4 imposes heightened costs on a "class of predominantly out-of-state residents." *Locke*, 634 F.3d at 1193. That kind of discouragement from entering the local market is all the Supreme Court has required in analogous practical-effect cases.

### (b)  *Rule 2-23.4 disproportionately imposes costs on out-of-state residents.*

The second *Locke* factor—whether Rule 2-23.4 "imposes costs on out-of-state residents that in-state residents do not have to bear," 634 F.3d at 1193—also favors Hernandez and Drwencke.

The Board charges heightened admission fees *only* to attorneys with out-of-state law licenses. Although the Rule does not say so on its face, the *effect* of this targeted tax falls disproportionately on non-Florida

residents: 55.3 percent of experienced-attorney applicants live outside of the state. Doc 98 – Pg 3; Doc 98-1 – Pg 3; Doc 68 – Pg 8; Doc 69-4 – Pgs 1-283. In contrast, the beneficiaries of the experienced-attorney fee—new attorneys who receive discount admission fees—are overwhelmingly Floridian: a whopping 86.8 percent of new-attorney applicants live in Florida. Doc 98-1 – Pg 3; Doc 68 – Pg 8; Doc 69-4 – Pgs 1-283.

The key to the practical-effects claim is the *discrepancy* between these two percentages. First compare the group of non-Florida residents that is burdened by the Rule (experienced attorneys with out-of-state licenses) to the group of non-Florida residents that *benefits* from it (new attorneys who receive fee discounts). Because over 55 percent of experienced-attorney applicants—but just 13.2 percent of new attorney-applicants—live *outside* Florida, Rule 2-23.4 *burdens* more than *four times as many* non-Florida residents as it benefits. *See Am. Trucking Ass'ns, Inc. v. Scheiner*, 483 U.S. 266, 286 (1987) ("In practical effect, since they impose a cost per mile on appellants' trucks that is approximately five times as heavy as the cost per mile borne by local trucks, the taxes are plainly discriminatory.")

Put another way, when it comes to attorneys who *do not* live in Florida, the fee policy operates to *burden* those non-residents at a vastly higher rate than it benefits them. In practice, very few non-Floridian applicants receive fee discounts, while most of those applicants must pay *higher* fees so those discounts can exist in the first place. "[S]pecial fees

39

assessed on nonresidents directly by the State when they attempt to use local services impose an impermissible burden on interstate commerce." *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 578 (1997). Rule 2-23.4 imposes just such "special fees" on nonresident experienced attorneys when they "attempt" to enter the "local" legal marketplace.

In concluding that the second factor favors the Board, the district court misunderstood a core Commerce Clause principle in two related ways. First, the district court noted that "both Florida residents and nonresidents pay higher fees under Rule 2-23.4," Doc 95 – Pg 11, implying that a law must *exclusively* burden out-of-state residents to violate the Constitution. The Supreme Court has repeatedly held otherwise. An "ordinance is no less discriminatory because in-state…[entities] are also covered by the prohibition." *C & A Carbone*, 511 U.S. at 391; *see Dean Milk*, 340 U.S. at 354 n.4 (striking down local Madison ordinance and finding it "immaterial that Wisconsin milk from outside the Madison area is subjected to the same proscription as that moving in interstate commerce"); *Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Nat'l Res.*, 504 U.S. 353, 353-54 (1992) (same). The fact that *some* Florida residents pay the experienced-attorney fee does not make the fee any less discriminatory.

Second, and conversely, the district court erroneously found that Rule 2-23.4 "does not *exclusively* benefit in-state interests." Doc 95 – Pg

12 (emphasis added). The district court cited no authority for the proposition that a law must "exclusively" benefit in-state interests to violate the Commerce Clause—and there is none. In fact, "where discrimination is patent, as it is here, neither a widespread advantage to in-state interests nor a widespread disadvantage to out-of-state competitors need be shown." *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 276 (1988) (striking down discriminatory statute even though "its practical scope is…limited" because "the size or number of the in-state businesses favored" was not relevant). The Supreme Court has never "recognized a '*de minimis'* defense to a charge of discriminatory taxation under the Commerce Clause," *Fulton Corp. v. Faulkner*, 516 U.S. 325, 334 (1996), and this Court "need not know how unequal the [t]ax is before concluding that it unconstitutionally discriminates," *Md. v. La.*, 451 U.S. 725, 760 (1981). As the Third Circuit put it, "[t]he relevant question here is whether there is *any* differential treatment of nonresident attorneys that favors in-state interests over out-of-state interests." *See Tolchin v. Sup. Ct. of the State of N.J.*, 111 F.3d 1099, 1107 (3d Cir. 1997) (emphasis added). What matters is the disparity between the *burden* on *out*-of-staters and the *benefit* to *in*-staters.

Put simply, Rule 2-23.4 is no less discriminatory because it does not burden *every single* non-Floridian applicant and benefit *every single* Floridian applicant. The question is whether the Rule "*effectively* favor[s] resident attorneys." *Tolchin*, 111 F.3d at 1108 (emphasis added); *see also*

41

*Camps Newfound*, 520 U.S. at 576 (striking down state property tax that "singl[es] out camps that serve *mostly* in-staters for beneficial tax treatment, and penalizing those camps that do a *principally* interstate business") (emphases added); *Cachia v. Islamorada*, 542 F.3d 839, 843 (11th Cir. 2008) (striking down square footage ordinance that "*disproportionately* targets restaurants operating in interstate commerce" and therefore "has the practical effect of discriminating against interstate commerce") (emphasis added). It does.

Requiring a perfect match between the Rule's effects and an applicant's residency would collapse the important distinction between facial discrimination and practical-effects discrimination. Here, the Rule is facially discriminatory because its plain text singles out experienced attorneys with out-of-state law licenses. *See infra* Part I.B. That match is 100 percent: *every* experienced attorney with an out-of-state license must pay the higher fee, while *no* experienced attorney licensed in Florida must do so. But practical-effect discrimination doesn't require this kind of surgical exactitude. If it did, the Supreme Court would require no analysis beyond the threshold facial-discrimination inquiry.

Even though this appeal does not involve the tier-two analysis set forth in *Pike v. Bruce Church*, that case nevertheless established a useful principle: a state statute's effects on interstate commerce need only be more than "incidental" to implicate the Commerce Clause; the question is "one of degree." 397 U.S. 137, 142 (1970). At day's end, "the critical

42

consideration is the overall effect of the statute on both local and interstate activity." *Brown-Forman*, 476 U.S. at 579. Because the burden Rule 2-23.4 imposes "falls by design in a predictably disproportionate way on out-of-staters, the pernicious effect on interstate commerce is the same as in [Supreme Court] cases involving taxes targeting out-of-staters alone." *Camps Newfound*, 520 U.S. at 579-80. The second *Locke* factor favors Hernandez and Drwencke.

### (c)    The Board concedes that Rule 2-23.4 was motivated by protectionism.

The Board has already admitted that Rule 2-23.4 is protectionist. The third *Locke* factor strongly favors Hernandez and Drwencke.

Initially, the Board claimed in its 1995 memorandum to the Florida Supreme Court that Rule 2-23.4 revenue would cover "the cost of the Board's background investigation for out-of-state attorneys," which it claimed "often increases in relationship to the number of years such attorneys have been admitted in their respective, foreign jurisdictions." Doc 80-2 - Pg 21. The Board did not disclose any additional use for Rule 2-23.4 fees. *See generally* Doc 80.2 - Pgs 21-22.

But midway through this litigation, the Board confessed to a *second* purpose behind Rule 2-23.4: "using revenue from the [experienced] attorney fee to provide 'early registration discounts to law students' and reduced application fees for newly licensed lawyers." Doc 45 - Pg 20 (quoting Doc 23 - Pgs 22-23). Gavagni disclosed that "the fee revenue

43

from experienced attorneys helps the FBBE pay its operating expenses while continuing to offer discounted application fees to students who register early in their first year of school." Doc 87-3 - Pg 9. As the district court wrote, "this justification essentially concedes that the attorney fee is greater than necessary to compensate for increased background-check expenses for previously licensed attorneys." Doc 45 - Pg 20 n.6.

It is no wonder that the Board didn't disclose to the Florida Supreme Court the true, protectionist reason behind Rule 2-23.4. As explained above, nearly *ninety percent* of new-attorney applicants who receive fee discounts are Florida residents. The Board admitted to using revenue from predominantly out-of-state residents to subsidize fee breaks for in-staters. That is classic economic protectionism, not "benign cost spreading." *Oregon Waste*, 511 U.S. at 106 (surcharge gave "those who handle domestic articles of commerce a cost advantage over their competitors handling similar items produced elsewhere"). The Rule also protects in-state interests by making it more expensive—and therefore less appealing—for attorneys barred elsewhere to practice in Florida. *See* Doc 107 – Pgs 12, 47-49. An attorney's "market rate" is "determined by supply and demand." *Dillard v. City of Greensboro*, 213 F.3d 1347, 1354-55 (11th Cir. 2000) (cleaned up). A Florida-licensed attorney will make more money if fewer attorneys are licensed in the state.

The district court claimed the Board's fee discount rationale was not protectionist because *some* Florida residents pay the increased fee

44

and *some* non-residents receive fee discounts. Doc 103 - Pgs 7-9. Like the district court's factor-two analysis, this conclusion flowed from a false premise—that the Commerce Clause only prohibits laws that burden *exclusively* non-residents and benefit *exclusively* residents. As set forth *supra* at Part I.C.3.b, that is wrong. That Rule 2-23.4 does not burden 100 percent non-residents and benefit 100 percent residents does not make the Board's motives any less protectionist. Indeed, under the district court's reasoning, a state could immunize itself from any claim of protectionism by granting some nominal out-of-state interest privileged access to the in-state market—say, lawyers from a remote region of Alaska, trash originating in Wyoming, or apples grown in Puerto Rico. But states can't escape the dormant Commerce Clause through this kind of formalistic evasion. What matters is the effect of the challenged policy in the aggregate, and here, the Rule overwhelmingly favors Florida residents and Florida law practices.

"Despite the [Rule's] facial neutrality,…its discriminatory impact on interstate commerce was not an unintended byproduct." *Hunt*, 432 U.S. at 352. Gavagni admitted in a sworn declaration that the Board uses revenue from experienced attorney fees to fund its own operations and subsidize discounts for in-state law students and new attorneys. *See* Doc 87-3 – Pg 9. That is more than enough to tip the third *Locke* factor in against immunity. But given the Rule's undeniable "discrimination against commerce, this Court "need not ascribe an economic protection

45

motive" to the Board "to resolve this case" for Hernandez and Drwencke. *Hunt*, 432 U.S. at 352.

## II.  THE BOARD AND GAVAGNI ARE NOT IMMUNE FROM HERNANDEZ'S DAMAGES CLAIMS.

The district court erred when held that the Board was entitled to Eleventh Amendment immunity and Gavagni to qualified immunity. Hernandez alleged that the Board is not an arm of the state and that years of clearly-established precedent put Gavagni on notice that Rule 2-23.4 violated the dormant Commerce Clause.

### A.  The Board Is Not Entitled to Eleventh Amendment Immunity.

The Board is not entitled to Eleventh Amendment immunity because it is not an "arm of the state."[4] To decide whether Eleventh Amendment immunity applies, this Court applies a four-factor test: "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." *Manders*, 338 F.3d at 1308. "In applying these four factors, [this Court] evaluate[s] both the governmental structure of the office vis-à-vis the State and the functions in issue." *Lake v. Skelton*, 840 F.3d 1334, 1337-38 (11th Cir. 2016) (cleaned up).

---

[4] Because official-capacity claims against Gavagni constitute claims against the Board itself, Gavagni is likewise not entitled to Eleventh Amendment immunity in her official capacity. *Schopler v. Bliss*, 903 F.3d 1373, 1378 & n.3 (11th Cir. 1990).

The *Manders* test favors Hernandez. As for the first three factors, the Rules define the Board as an independent entity funded exclusively by applicant fees over which the Florida Supreme Court maintains little control. And as for the fourth and most significant factor, only the Board is responsible for money judgments against it. The Florida Supreme Court has decreed that a "full refund" is the "only clear and certain remedy" in analogous circumstances. *Kuhnlein*, 646 So.2d at 726 (Commerce Clause violation required Florida to refund "all who have paid this illegal tax" despite Florida's claim of sovereign immunity).

### (1)    The Rules of the Florida Supreme Court define the Board as an independent agency.

The first *Manders* factor—how state law defines the entity in question—is neutral. The Rules of the Supreme Court Relating to Admissions to the Bar establish the Board as an administrative agency, separate from the Supreme Court and the state. And while the Rules of Judicial Administration define the Board as part of the judicial system, they do so only for record retention purposes. *See* Fla. R. Jud. Admin. 2.440(a)(1) (defining "judicial branch" to include the Board for purposes of the "Retention of Judicial Branch Administrative Records").

To the extent any questions remain about how the state defines the Board, discovery must answer them.

### (2) The Florida Supreme Court exercises little control over the Board.

Because the Florida Supreme Court "retains little control over the Board," Doc 107 – Pg 23, the second *Manders* factor favors Hernandez, *J.P.M. v. Palm Beach Cnty. Sch. Bd.*, No. 10-cv-80473, 2011 WL 13281800, at *3 (S.D. Fla. Mar. 29, 2011) (school board not an arm of the state where it "had substantial control over its own affairs") (citing *Travelers Indem. Co. v. Sch. Bd. of Dade Cnty., Fla.*, 666 F.2d 505, 509 (11th Cir. 1982)).

At the motion-to-dismiss stage, the district court erred in concluding that factor two favors the Board. Contrary to the district court's unsupported declaration, Hernandez does *not* "agree that the Florida Supreme Court…controls the FBBE." Doc 45 – Pg 9. He pleaded precisely the opposite, Doc 107 – Pg 23, allegations the district court was bound to credit but instead ignored. To the extent the Florida Supreme Court's approval of the Board's budgets suggests any degree of control, the Board's financial independence (factor three) and responsibility for judgments against it (factor four) are far more significant aspects of the *Manders* inquiry.

As with factor one, only discovery can ascertain how much control the Supreme Court exercises over the Board. *See, e.g.*, *Misener Marine Constr., Inc. v. Norfolk Dredging Co.*, No. 404-cv-146, 2005 WL8156248, at *1 (S.D. Ga. Dec. 14, 2005) (allegations that "the totality of the facts favor a finding that [Georgia Ports Authority's] control over itself

48

outweighs that of the State of Georgia" were "sufficient to withstand GPA's motion to dismiss" under Eleventh Amendment, even where "the State of Georgia does have some control over certain aspects of GPA's operations").

### (3) The Board derives its funds exclusively from applicant fees.

As the district court correctly held, factor three favors Hernandez because "the FBBE is not funded from general tax measures," Doc 40 – Pg 8, but exclusively from bar applicant fees, Doc 107 – Pg 22; Doc 107-1 – Pg 19; *see Travelers*, 666 F.2d at 509 (school board was not an arm of the state where it had "substantial other funds which were available for [judgment] without reference to the particular allotment of" state monies).

Citing *Miccosukee Tribe of Indians of Florida v. Florida State Athletic Commission*, 226 F.3d 1226, 1233 (11th Cir. 2000), the district court held that this factor "is not dispositive," Doc 40 – Pgs 8-9. That's true, as far as it goes—but in *Miccosukee*, the "State Treasurer, and not the Commission, pays the Commission's expenses," and excess money from the commission's trust fund "goes to the state's general revenue fund." *Id.* Nothing of the sort is true of the Board, whose assets remain sequestered and independent from state funds. Doc 107 – Pg 22.

### (4)    The Board is exclusively responsible for money judgments against it.

"The question whether a money judgment against a state instrumentality…would be enforceable against the State is of considerable importance" in determining Eleventh Amendment immunity. *Regents of the Univ. of Ca. v. Doe*, 519 U.S. 425, 430 (1997). Because the Board—and not the state—would cover any money judgment against it, Doc 107 – Pgs 22-23, the fourth and most significant *Manders* factor cuts strongly against immunity.

The law in the Supreme Court and this Circuit is clear: "Eleventh Amendment immunity applies only if the judgment *must*, under all circumstances, be paid out of state funds." *Jackson v. Ga. Dep't of Transp.*, 16 F.3d 1573, 1577 (11th Cir. 1994) (no Eleventh Amendment immunity because voluntary state liability insurance trust fund did not make state "real party in interest"); *Edelman v. Jordan*, 415 U.S. 651, 663 (1974) (Eleventh Amendment bars suits "seeking to impose a liability which *must* be paid from public funds in the state treasury") (emphasis added). This is a bright line rule. The judgment must "to a virtual certainty be paid from state funds." *Travelers*, 666 F.2d at 509. In other words, there can be no immunity if there is even a *chance* that state funds will *not* fund a particular judgment. *See Abusaid v. Hillsborough Cnty. Bd. of Cnty. Comm'rs*, 405 F.3d 1298, 1313 (11th Cir. 2005) (sheriff not immune where "the fact that a judgment against [him]…would *not* be paid out of the state treasury is, in itself, a clear marker that the Sheriff

50

is not an arm of the state"); *Pellitteri v. Prine*, 776 F.3d 777, 783 (11th Cir. 2015) ("to the extent that the state treasury will be spared here from paying any adverse judgment, this factor weighs in favor of denying immunity").

The district court's conclusion that the Board enjoys Eleventh Amendment immunity flouts this well-established precedent. Hernandez alleged, in detail, that the Board—and *not* the state of Florida—would cover any money judgment against it, effectively refunding fees that were collected exclusively from overcharged bar applicants. He alleged that:

- o State treasury funds *are not used* to cover Board liabilities. Doc 107 - Pgs 22-23.

- o The Board is solely responsible for satisfying its financial obligations. Doc 107 - Pgs 22-23.

- o The Board is prohibited from using the public fisc to pay out a damages award. Doc 107 - Pg 23.

- o The Board must bond its own directors and employees. Doc 107 - Pg 22.

- o The Board has no right to indemnification from the Supreme Court. Doc 107 - Pg 23.

- o The Board's funds are maintained at a private bank, *not* commingled with public funds in the state treasury. Doc 107 - Pg 22.

On a motion to dismiss, and given this Circuit's bright line rule about state treasury funds, the district court should have allowed Hernandez's damages claims to proceed. That's because whether state funds would—"in all circumstances," *Jackson*, 16 F.3d at 1577—cover a

damages award against a state entity "is a fact question which must be determined in every case where Eleventh Amendment immunity is involved," *Carr v. City of Florence, Ala.*, 916 F.2d 1521, 1528 (11th Cir. 1990) (Clark, J., specially concurring in the judgment) (cleaned up).

Instead, the district court failed to credit any of Hernandez's allegations, concluding *before discovery* that "existing FBBE funds" somehow constitute "funds in the state treasury." Doc 45 – Pg 7. In dismissing the damages claim outright, the district court deprived Hernandez of the opportunity to prove his allegation that Florida would *not* as a "virtual certainty" pay a judgment against the Board. *Travelers*, 666 F.2d at 509. That was error.

None of the cases the district court invoked support its conclusion. *Fouche v. Jekyll Island-State Park Authority* granted Eleventh Amendment immunity to the Park Authority because "*presumably* the state would be responsible for any debts incurred by [the Authority[ that could not be paid out of its revenues." 713 F.2d 1518, 1521 (11th Cir. 1983). But this conclusion predated by more than a decade this Court's holding in *Jackson* that, for Eleventh Amendment immunity to attach, a money judgment *must* come from state funds. "Presumably" is insufficient. *See Sea Servs. of the Keys v. State of Fla.*, 156 F.3d 1151, 1153-54 (11th Cir. 1998) (Florida Department of Environmental Protection not entitled to Eleventh Amendment immunity where salvage award did not implicate state funds). In fact, the "mere[] assum[ption]

that the state would pay the costs" of a judgment against the Board—which is all the district court could muster—"completely reverses the appropriate judicial standard": whether there is a "virtual certainty that the *state* will foot the bill." *Carr*, 916 F.2d at 1528 (cleaned up); *see also Auer v. Robbins*, 519 U.S. 452, 456 n.1 (1997) (Board of Police Commissioners not immune where "the city of St. Louis is responsible for the board's financial liabilities"). And in *Jagnandan v. Giles*, the district court's other main authority, Doc 45 – Pg 8, the money judgment in question "would *necessarily* come from state funds," 538 F.2d 1166, 1180 (5th Cir. 1976) (emphasis added)—unlike this case.

The district court's other authority is off-point for various reasons. *Uberoi v. Supreme Court of Florida* held—without analysis—only that the Florida Supreme Court was entitled to sovereign immunity, never addressing the Board. 819 F.3d 1311, 1313-14 (11th Cir. 2016). *Ramos v. Tomasino* addressed the Board's immunity from antitrust liability, not its Eleventh Amendment immunity. 701 F. App'x 798, 803-04 (11th Cir. 2017); *see also Mueller v. Fla. Bar*, 390 So.2d 449, 451 (Fl. 4th DCA 1980) (addressing only absolute privilege of the Florida bar); *Hobbs v. Fla. Bd. of Bar Exam'rs*, No. 17-cv-422, 2018 WL 5905467, at *6 (N.D. Fla. June 16, 2018) (addressing only merits of Rehabilitation Act claim against the Board). And *Diaz v. Moore* predated *Manders*, conducted no Eleventh Amendment analysis, and cited nonbinding Sixth Circuit law in immunizing the Board in a footnote. 861 F. Supp. 1041, 1048 n.22 (N.D.

Fla. 1994); *see also Stoddard v. Fla. Bd. of Bar Exam'rs*, 509 F. Supp. 2d 1117 (N.D. Fl. 2006) (immunizing Board from damages claims with no analysis).

To sum up: Hernandez alleged that any judgment against the Board would be drawn exclusively from *Board* funds maintained in *Board* bank accounts—not, under any circumstances, from the Florida state treasury. Doc 107 – Pgs 22-23. There can be no immunity where a money judgment will not draw on state funds. Hernandez's damages claim must be reinstated.

## B.   Gavagni Is Not Entitled to Qualified Immunity.

Qualified immunity does not protect Gavagni, in her personal capacity, from Hernandez's damages claims. More than thirty years ago, the Supreme Court held in *Oregon Waste* that states may not levy higher surcharges against out-of-state items of commerce simply because they come from out-of-state. That clearly-established rule applies to the experienced-attorney fee, which is a higher surcharge levied only against out-of-state law licenses. Gavagni was on fair notice that Rule 2-23.4 violated the Commerce Clause.

"[A] general constitutional rule…may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (cleaned up). "We do not require a case directly on point before concluding that the law is clearly established." *Stanton v. Sims*, 571 U.S.

54

3, 5 (2013). And a "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *United States v. Lanier*, 520 U.S. 259, 271 (1997) (cleaned up) (rejecting requirement that Supreme Court must have established constitutional right at issue in "fundamentally similar" factual situation). "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning." *Id.*

For all the reasons set forth above, the Rule violates Hernandez's right under the Commerce Clause to be free from financial penalties based solely on his attempt to bring an out-of-state item of commerce (a law license) into the Florida legal marketplace. And that right was clearly established in *Oregon Waste*. As the Supreme Court confirmed shortly after it decided that case, *Oregon Waste* confirmed the "well-settled principle[] of…Commerce Clause jurisprudence" that "revenue generation"—the Board's admitted purpose behind the Rule, Doc 45 – Pg 20 (quoting Doc 23 – Pgs 22-23)—"is not a local interest that can justify discrimination against interstate commerce," *C & A Carbone*, 511 U.S. at 386, 393 (invalidating flow control ordinance requiring all solid waste to be processed at designated local transfer station).

The district court erred in implying that only a case "showing that Florida's attorney fee provision violates the dormant commerce clause" could suffice to clearly establish Hernandez's rights under the Commerce

55

Clause. Doc 40 – Pg 10. But the Supreme Court has never required a perfect factual match for caselaw to clearly establish a constitutional right, especially where the challenged conduct did not involve split-second decisionmaking or police exigency. The district court's only analysis on this point was based on the same misunderstanding of *Oregon Waste* that led it to dismiss the facial-discrimination claims. *See* Doc 45 – Pgs 12-13. Contrary to the district court's conclusion, Oregon *did* invoke "the same asserted justifications this case involves." Doc 45 – Pg 12. In *Oregon Waste*, the state sought to "reduc[e] the costs of handling in-state waste." 511 U.S. at 106. Here, Florida seeks to reduce the costs of bar applications for in-state residents. Doc 45 – Pg 20 (quoting Doc 23 – Pgs 22-23). Both *Oregon Waste* and this case feature surcharges on out-of-state items of commerce (waste; law licenses) that generate revenue to support in-state processing costs (waste disposal; law licensing).

The district court was only stating the obvious when it noted that *Oregon Waste* is "factually distinct." Doc 45 – Pg 12. The Supreme Court itself has held that its "Commerce Clause jurisprudence s not so rigid as to be controlled by the form by which a State erects barriers to commerce." *W. Lynn Creamery*, 512 U.S. at 201 (requiring a "sensitive, case-by-case analysis of purposes and effects"). But the fact that a state can flout the Commerce Clause in a virtually infinite variety of ways does not make the key principles of antidiscrimination enunciated by the Supreme Court any less clear. "The commerce clause forbids

discrimination, whether forthright or ingenious. In each case it is our duty to determine whether the statute under attack, whatever its name may be, will in its practical operation work discrimination against interstate commerce." *Best & Co. v. Maxwell*, 311 U.S. 454, 455-56 (1940).

Rule 2-23.4 may be "ingenious" in its particulars, but its discriminatory nature is "forthright"—as is the fact that it violates principles set forth long ago by the Supreme Court. Gavagni is not entitled to qualified immunity.

## <u>CONCLUSION</u>

Hernandez and Drwencke respectfully request that this Court reverse the district court's (1) dismissal of Hernandez's damages claims; and (2) dismissal of the facial-discrimination claim; and (3) denial of Hernandez's and Drwencke's motion for partial summary judgment on the practical-effects discrimination claim.


Date: January 23, 2025            Respectfully submitted,


                                 <u>s/ Emma Freeman</u>
                                 Emma Freeman
                                   *Counsel of Record*
                                 APOLLO LAW LLC
                                 1000 Dean Street
                                 Suite 101
                                 (646) 363-6766
                                 emma@apollo-law.com

Adam W. Hansen
APOLLO LAW LLC
333 Washington Avenue North
Suite 300
Minneapolis, MN 55401

Michael J. DeBenedictis
Efthimios Parasidis
DEBENEDICTIS & DEBENEDICTIS LLC
20 Brace Road, Suite 350
Cherry Hill, NJ 08034

*Counsel for Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify pursuant to Fed. R. App. P. 32(g)(1) that the Appellant's brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this Brief contains 12,925 words, in other words, no more than 13,000 words, including footnotes and excluding the parts of the Brief exempted by Fed. R. App. P. 32(f). In addition, this Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this Brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016, Century Schoolbook font in 14 point size, with footnotes in Century Schoolbook font in 14 point size.

<u>s/ Emma Freeman</u>
Emma Freeman

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 23rd day of January, 2025, I caused the foregoing brief and addendum to be filed electronically with the Court, where they are available for viewing and downloading from the Court's ECF system, and that such electronic filing automatically generates a notice of electronic filing constituting service. I certify that all parties required to be served have been served.

<u>s/ Emma Freeman</u>
Emma Freeman