Case No. 24-13543

——————————————

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

——————————————

STEVEN W. HERNANDEZ and DAVID DRWENCKE,
on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants,*

v.

FLORIDA BOARD OF BAR EXAMINERS and MICHELE A.
GAVAGNI, Executive Director of the Florida Board of Bar Examiners,
in both her individual and official capacities,

*Defendants-Appellees.*

——————————————

On Appeal from the United States District Court
for the Northern District of Florida (Case No. 4:21-cv-00247)
The Honorable Allen C. Winsor

——————————————————————————————

## APPELLANTS' REPLY BRIEF

——————————————————————————————

Adam W. Hansen
APOLLO LAW LLC
333 Washington Avenue North
Suite 300
Minneapolis, MN 55401

Emma Freeman
*Counsel of Record*
APOLLO LAW LLC
1000 Dean Street
Suite 101
Brooklyn, NY 11205
emma@apollo-law.com
(646) 363-6766

[*additional counsel listed on inside cover*]

Michael J. DeBenedictis
Efthimios Parasidis
DEBENEDICTIS & DEBENEDICTIS LLC
1415 Route 70 East
Suite 103
Cherry Hill, NJ 08034

**U.S. COURT OF APPEALS FOR THE ELEVENTH CIRCUIT**

**CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT (CIP)**

_____ *vs.* _____ Appeal No. _____

11th Cir. R. 26.1-1(a) (enclosed) requires the appellant or petitioner to file a Certificate of Interested Persons and Corporate Disclosure Statement (CIP) with this court within 14 days after the date the case or appeal is docketed in this court, and to include a CIP within every motion, petition, brief, answer, response, and reply filed. Also, all appellees, intervenors, respondents, and all other parties to the case or appeal must file a CIP within 28 days after the date the case or appeal is docketed in this court. **You may use this form to fulfill these requirements.** In alphabetical order, with one name per line, please list all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party.

*(please type or print legibly)*:

_____

_____

_____

_____

_____

_____

_____

_____

_____

Rev.: 12/16

**Hernandez, et al. v. Florida Board of Bar Examiners, et al., No. 24-13543**

**CERTIFICATE OF INTERESTED PERSONS ADDENDUM**

Apollo Law, LLC

Dean, James Joseph

DeBenedictis, Michael

Drwencke, David

Florida Board of Bar Examiners

Freeman, Emma

Gavagni, Michele A.

Hansen, Adam W.

Hernandez, Steven W.

McNeely, Robert Andrew

Messer Caparello, P.A.

Pafford, William

Parasidis, Efthimios

**Emma Freeman, Counsel for Appellants, certifies that:**

**(1) no publicly traded company or corporation has an interest in the outcome of this appeal, and**

**(2) this Certificate of Interested Persons is complete to the best of Counsel's knowledge.**

November 13, 2024

_____
Emma Freeman
Counsel for Appellants

ii

## TABLE OF CONTENTS

INTRODUCTION......................................................................................1

ARGUMENT ............................................................................................2

I.  RULE 2-23.4 VIOLATES THE DORMANT COMMERCE
    CLAUSE ..........................................................................................2

   A.  The Rule Facially Discriminates Against Interstate
       Commerce...............................................................................2

       (1)  Applicants with out-of-state licenses seeking to
            enter the Florida legal market are similarly
            situated to applicants without such licenses.................3

       (2)  Rule 2-23.4 functions as a tax on attorneys
            licensed to practice outside of Florida ..........................7

       (3)  Residency is not dispositive of the facial-
            discrimination claims in this case ...............................11

       (4)  The Board does not dispute that multiple
            nondiscriminatory alternatives are available ............16

   B.  The Rule Discriminates Against Interstate Commerce in
       Practical Effect ....................................................................16

       (1)  Drwencke did not forfeit his residency-based
            practical-effects argument .........................................17

       (2)  Properly applied, the *Locke* factors show
            discrimination in practical effect................................19

          (a)  The Board's "exclusion from the market"
               cases are all inapposite .....................................19

          (b)  *The Rule disproportionately burdens out-of-
               state residents for the specific purpose of
               benefiting Florida's in-state interests*..................21

II.    THE BOARD AND GAVAGNI ARE NOT IMMUNE FROM
       HERNANDEZ'S DAMAGES CLAIMS ........................................... 23

       A.    The Board Is Not Entitled to Eleventh Amendment
             Immunity.................................................................................. 23

       B.    Gavagni Is Not Entitled to Qualified Immunity .................. 26

       C.    The Board's Alternative Arguments for Dismissing the
             Claim Against Gavagni All Fail............................................ 27

CONCLUSION ......................................................................................... 28

CERTIFICATE OF SERVICE....................................................................

CERTIFICATE OF COMPLIANCE...........................................................

# TABLE OF AUTHORITIES

## CASES

*Am. Trucking Ass'ns, Inc. v. Scheiner,*
    483 U.S. 266 (1987) ........................................................................ 8

*Belik v. Carlson Travel Grp., Inc.,*
    864 F. Supp. 2d 1302 (S.D. Fla. 2011) ........................................... 27

*Boston Stock Exch. v. State Tax Comm'n,*
    429 U.S. 318 (1977) ........................................................................ 9

*C & A Carbone, Inc. v. Town of Clarkstown,*
    511 U.S. 383 (1994) ................................................................. 5, 23

*Cichowski v. Totten,*
    No. 24-10195, 2024 WL 2182487 (11th Cir. 2024) ......................... 24

*Comptroller of Treasury v. Wynne,*
    575 U.S. 542 (2015) ................................................................. 9, 11

*Dep't of Revenue v. Davis,*
    *553 U.S. 328 (2008)* .................................................................. *3–4*

*Dep't of Revenue v. Kuhnlein,*
    646 So.2d 717 (1994) ......................................................... 6, 23, 26

*Fla. Bar re Advisory Op.—Out-of-State Attorney Working Remotely from Fla. Home,*
    318 So.3d 538 (2021) ............................................................. 10–11

*Flynt v. Bonta,*
    131 F.4th 918 (9th Cir. 2025) ....................................................... 19

*Forrester v. White,*
    484 U.S. 219 (1988) ..................................................................... 27

*Freyre v. Chronister*,
    910 F.3d 1371 (11th Cir. 2018) ............................................... 23–24

*Fulton Corp. v. Faulkner*,
    516 U.S. 325 (1996) ...................................................................... 22

*Garber v. Menendez*,
    888 F.3d 839 (6th Cir. 2018) ........................................................ 20

*Granholm v. Heald*,
    544 U.S. 460 (2005) ...................................................................... 21

*Gravel v. United States*,
    408 U.S. 606 (1972) ...................................................................... 28

*Hinson v. Lott*,
    75 U.S. (8 Wall.) 148 (1868) .......................................................... 8

*Hughes v. Oklahoma*,
    441 U.S. 322 (1979) ...................................................................... 16

*Hunt v. Wa. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ...................................................................... 12

*I.M. Darnell & Son Co. v. City of Memphis*,
    208 U.S. 113 (1908) ........................................................................ 8

*Locke v. Shore*,
    634 F.3d 1185 (11th Cir. 2011) ........................................ 16, 19, 21

*Manders v. Lee*,
    338 F.3d 1304 (11th Cir. 2003) (en banc) ............................... 23–24

*Nat'l Ass'n for Adv. of Multijurisdiction Practice v. Berch*,
    773 F.3d 1037 (9th Cir. 2014) .................................................. 12–15

*Nat'l Ass'n for Adv. Of Multijurisdiction Practice v. Castille*,
    799 F.3d 216 (3d Cir. 2015)...................................................... 12–15

*Nat'l Pork Producers Council v. Ross,*
    598 U.S. 356 (2023) ...................................................... 12

*Or. Waste Sys., Inc. v. Dep't of Env. Quality,*
    511 U.S. 93 (1994) ..................................... 5, 7, 12, 26–27

*Regan v. City of Hammond,*
    934 F.3d 700 (7th Cir. 2019) ......................................... 20

*Ross v. Jefferson Cnty. Dep't of Health,*
    701 F.3d 655 (11th Cir. 2012) ....................................... 25

*Sapuppo v. Allstate Floridian Ins. Co.,*
    739 F.3d 678 (11th Cir. 2014) ....................................... 17

*Sestric v. Clark,*
    765 F.2d 655 (7th Cir. 1985) ......................................... 15

*Silberman v. Miami Dade Transit,*
    927 F.3d 1123 (11th Cir. 2019) ................................ 23–24

*Staub v. City of Baxley,*
    355 U.S. 313 (1958) ...................................................... 17

*Stoddard v. Fla. Bd. of Bar Exam'rs,*
    509 F. Supp. 2d 1117 (N.D. Fla. 2006)........................... 24

*Stump v. Sparkman,*
    435 U.S. 349 (1978) ...................................................... 28

*Tolchin v. Sup. Ct. of N.J.,*
    111 F.3d 1099 (3d Cir. 1997)......................................... 15

*Virgin Islands Am. Resort Dev. Ass'n v. Gov't of Virgin Islands,*
    848 F. App'x 79 (2d Cir. 2021)....................................... 22

*Ward v. Maryland,*
    79 U.S. (12 Wall.) 418 (1870) ......................................... 8

*Webber v. Virginia*,
   103 U.S. 344 (1880) ........................................................................... 8

*Welton v. Missouri*,
   91 U.S. 275 (1875) ......................................................................... 11

*W. Lynn Creamery, Inc. v. Healy*,
   512 U.S. 186 (1994) .................................................................... 1–2

## RULES

Rule of the Sup. Ct. of Fla. Relating to Admissions to the Bar 2-23.4
   ........................................................................1–2, 6–9, 13, 15, 20, 25–27

## <u>INTRODUCTION</u>

The Board does not dispute the core principles underlying this appeal. Law licenses are economic interests protected by the Commerce Clause. Rule 2-23.4 imposes heightened admission fees on *only* those attorneys seeking to enter the Florida legal market who have *out-of-state* economic interests—that is, attorneys who are already licensed in other states. Contrary to what the Board told the Florida Supreme Court when it submitted the Rule for approval, the Board secretly diverts that heightened-fee revenue to fund its early-registration program, which benefits Florida residents almost exclusively. By erecting a financial barrier around Florida's legal market, the Rule functions as a targeted tax that only applicants with out-of-state business interests have to pay.

The Rule's scheme thus commits a cardinal constitutional sin: "[p]reserv[ing] local industry by protecting it from the rigors of interstate competition." *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 205 (1994). That's "the hallmark of the economic protectionism that the Commerce Clause prohibits." *Id*.

Rather than address these points head-on, the Board tries to muddy the waters by attacking straw-man arguments, ignoring key elements of the record, and pretending that all manner of discrimination against interstate commerce is permissible so long as it is *not* on the basis of residency. None of these tactics warrants affirming the district court's erroneous judgment. Properly framed, Rule 2-23.4 is just the latest of

1

many "state laws that aspire to reap some of the benefits of tariffs by other means." *Id.* at 193. "If [this Court] were to accept [the Board's] arguments, [it] would make a virtue of the vice that the rule against discrimination condemns." *Id.* at 205.

This Court should reverse.

**ARGUMENT**

## I.    RULE 2-23.4 VIOLATES THE DORMANT COMMERCE CLAUSE.

On its face, Rule 2-23.4 imposes heightened bar admission fees *only* on Florida bar applicants who have been licensed to practice elsewhere for at least one year. This tax against out-of-state economic interests is a textbook violation of the dormant Commerce Clause, both facially and in practical effect.

### A.    The Rule Facially Discriminates Against Interstate Commerce.

The Rule is a classic tax that facially discriminates against out-of-state economic interests for Florida's benefit. Four interrelated principles show why.

First, the Rule discriminates on its face between two similarly-situated groups of applicants: attorneys seeking entry to the Florida legal market *who are already licensed in another state* and attorneys seeking entry to the Florida legal market *who are not*.

Second, the Rule functions as a tax on out-of-state economic interests: law licenses issued by any state other than Florida.

2

Third, residency-based discrimination—which is irrelevant to the facial-discrimination claim in this case—is just one type of dormant Commerce Clause violation. Of course, states may not discriminate against nonresidents, but they are equally forbidden from discriminating against out-of-state economic interests.

Fourth, various nondiscriminatory alternative fee structures are available to the Board.

As it did before the district court, the Board misconstrues the relevant comparators, pretends the Rule is not a tax, hides behind the red-herring concept of residency, and ignores the availability of nondiscriminatory alternatives. These obfuscatory arguments all fail.

### (1) Applicants with out-of-state licenses seeking to enter the Florida legal market are similarly situated to applicants without such licenses.

The Board claims that Hernandez and Drwencke can't show facial-discrimination because they're using the wrong comparators: law-student and new-attorney applicants versus experienced-attorney applicants. *See* App. Br. at 38. This is a straw-man argument.

Hernandez and Drwencke have never tried to compare new-attorney applicants to experienced applicants. Instead, the "substantially similar entities" at play are: (1) applicants to the Florida Bar who have been licensed to practice in other states for at least one year, and (2) applicants to the Florida Bar who have not. *Dep't of Revenue v. Davis*,

553 U.S. 328, 342–43 (2008). *All* applicants to the Florida Bar are similarly situated in that they are seeking to enter the Florida legal market for the first time. To accomplish that goal, *all* applicants must take the Florida bar exam. That's true regardless of whether an applicant has practiced for one year or ten, whether she is still in law school, or where she resides. The only relevant distinction within this pool of applicants is between attorneys *with* out-of-state licenses and attorneys *without* such licenses.

With the correct comparators in mind, it's easy to see how the Rule discriminates on its face. Every attorney seeking to enter the Florida legal market must pay an admission fee to take the bar exam. But of those attorneys, *only* applicants already licensed elsewhere must pay up to a *tripled* fee.

The Board never disputes that the plain text of the Rule explicitly singles out applicants with out-of-state licenses. It protests only that (1) "[l]aw students are in a different financial situation from experienced lawyers," App. Br. at 16, and (2) experienced-attorney background investigations are more expensive, App. Br. at 16–17, 21. Both of these arguments proceed from the false premise that Hernandez and Drwencke are comparing law students and new attorneys with experienced attorneys. They are not. But that threshold issue aside, neither of the Board's claims render the Rule any less discriminatory.

4

The Board tries to justify the Rule by declaring that students have less money than experienced lawyers. But applicants' financial status is constitutionally irrelevant. The question in this case is whether the Board may tax attorneys with out-of-state licenses in the first place, *not* whether experienced attorneys are more equipped to pay a tax than new-attorney applicants. A tax cannot survive Commerce Clause scrutiny simply because the taxed entity can shoulder the economic burden wrongly imposed on it. *See C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 389–92 (1994). Florida cannot subsidize its discount program by overcharging out-of-state-licensed attorneys, even if those attorneys can afford it.

The Board's assertion that the Rule merely subsidizes the extra costs of experienced-attorney background investigations similarly misses the mark. A so-called compensatory tax "must be shown roughly to approximate—*but not exceed*—the amount of the tax on intrastate commerce." *Or. Waste Sys., Inc. v. Dep't of Env. Quality*, 511 U.S. 93, 103 (1994) (emphasis added). But the Rule is no compensatory tax. The record is unequivocal: The Rule's revenue is manifestly disproportionate to any increased costs. To put a finer point on it, the Rule's revenue far exceeds not only the additional costs of conducting background checks on experienced attorneys—which the Board has never calculated—but the *entire* payroll of the investigation department, which conducts up to 3,800 background checks per year. Doc 107-1 – Pg 19. While the Board collects

5

between $900,000 and $1,000,000 annually from experienced-attorney fees, it spends less than $700,000 conducting *all* of its background checks—on both new *and* experienced applicants. Doc 107-1 – Pg 19. Whatever marginally-increased amount the Board spends to conduct experienced-attorney background checks, that amount necessarily pales in comparison to the actual fees generated by Rule 2-23.4. This disproportionality is fatal to the Board's compensatory-tax defense.

The same disproportionality also undoes the Board's specious argument that the Florida Supreme Court "clearly saw a distinction between the law in *Kuhnlein* and Rule 2-23.4" because that court approved the Rule after it decided *Kuhnlein*. App. Br. at 32 n.5 (citing *Dep't of Revenue v. Kuhnlein*, 646 So.2d 717 (Fla. 1994)). The Florida Supreme Court approved the Rule only after the Board presented it as a compensatory tax necessary to fund experienced-attorney background checks. But the Board omitted three key facts from its proposal: first, that the Rule's revenue far outstripped additional background-check costs; second, that the Rule's *true* purpose was to fund Florida's early-registration program; and third, that the Rule has generated a significant budget surplus that subsidizes *all* the Board's licensing operations. In other words, the Supreme Court signed off on the Rule without anything close to the full picture. And in all events, the mere approval of the Rule, outside the adversarial process, cannot plausibly be read as an analysis of the Rule's legality under the dormant Commerce Clause.

The Board finally leverages its false-comparator argument to try to circumvent *Oregon Waste*, which applies squarely to this case. According to the Board, the statute in *Oregon Waste* was different from Rule 2-23.4 because the former "discriminated against substantially similar entities" by "taxing an item of commerce when it crossed state lines." App. Br. at 30. But the Rule does that, too: Applicants with law licenses from out-of-state (which are, of course, items of commerce) incur extra charges when they "cross state lines" by taking the Florida bar to enter the Florida legal market. Nor can the Board distinguish *Oregon Waste* on the ground that "all similarly-situated attorney applicants are treated the same" under Rule 2-23.4. App. Br. at 30. The text of the Rule says the opposite. One group of applicants (attorneys seeking to enter the Florida market who have already been licensed elsewhere for at least a year) must pay up to $3,000 to take the Florida bar. Another group of applicants (attorneys seeking to enter the Florida market who are *not* so licensed) pay at most $1,000. That's differential treatment of similarly-situated applicants, none of whom has a Florida license and all of whom seek to obtain one.

### (2)    Rule 2-23.4 functions as a tax on attorneys licensed to practice outside of Florida.

The district court and the Board fundamentally misunderstood Rule 2-23.4. The Rule is not a residency regulation, but something categorically different: a tax against out-of-state business interests seeking to enter the Florida market.

Taxes on out-of-state goods have been held unconstitutional for more than 150 years. That's because such taxes, if implemented nationwide, would yield "a total abolition of all commercial intercourse between the States, under the cloak of the taxing power." *Hinson v. Lott*, 75 U.S. (8 Wall.) 148, 152 (1868) (Commerce Clause forbids "a discriminating tax, levied exclusively upon the products of sister States," *id.* at 151); *Ward v. Maryland*, 79 U.S. (12 Wall.) 418, 429 (1870) ("a tax discriminating against the commodities of the citizens of the other States of the Union would be inconsistent with the provisions of the Federal Constitution"); *Webber v. Virginia*, 103 U.S. 344, 350 (1880) (same); *I.M. Darnell & Son Co. v. City of Memphis*, 208 U.S. 113, 120 (1908) (same).

These principles apply equally to taxes on out-of-state businesses or services. After all, "a State may not tax a transaction…more heavily when it crosses state lines than when it occurs entirely within the State." *Am. Trucking Ass'ns, Inc. v. Scheiner*, 483 U.S. 266, 280 (1987). Break this statement down to see how it applies to Rule 2-23.4. The "transaction" here is the process of obtaining a license to practice law in Florida. When attorneys licensed elsewhere obtain a Florida license, the "transaction" "crosses state lines"—applicants who already have "entrance tickets" to other states' legal markets punch their tickets to enter Florida's market. In contrast, when attorneys *not* licensed in other states seek entry to the Florida bar, the "transaction…occurs entirely within the State." The Rule therefore discriminates against only those

transactions with "some interstate element"—namely, an out-of-state law license. *Boston Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 332 n.12 (1977).

The Supreme Court's "internal consistency" test, "which helps courts identify tax schemes that discriminate against interstate commerce," illuminates the discrimination at play here. *Comptroller of Treasury v. Wynne*, 575 U.S. 542, 562 (2015). That test asks whether the "identical application [of a tax] by every State in the Union would place interstate commerce at a disadvantage as compared with commerce intrastate." *Id*. (cleaned up). Rule 2-23.4 flunks this test. "If each State imposed flat taxes for the privilege of making commercial entrances into its territory, there is no conceivable doubt that commerce among the States would be deterred." *Am. Trucking*, 483 U.S. at 284. The "inevitable effect" of the Rule's fee scheme "is to threaten the free movement of commerce by placing a financial barrier around the State of [Florida]." *Id.* Only lawyers with established business interests *outside of* Florida are penalized with heightened fees when they seek to obtain a law license *in* Florida. If every state adopted this scheme, attorneys would be financially discouraged across the board from practicing law in multiple states' markets. The Commerce Clause was designed to prohibit just this pattern of protectionism and Balkanization.

The Board's two-sentence response to this clear-cut analysis addresses only the flimsiest of straw-man points. The Board writes:

> The Rule also does not tax an attorney's non-Florida license when it is brought into Florida from another state. Appellants are free to come and go from Florida and use their non-Florida licenses to practice New Jersey and Illinois law, respectively, without paying anything.

App. Br. at 31. Because the Board wrongly assumes that "crossing state lines" must be literal and not figurative, this response misses the point. The Rule penalizes an attorney for seeking to obtain a Florida license regardless of his physical location. It does *not* penalize him for becoming a resident of Florida. The fact that Hernandez and Drwencke are "free to come and go from Florida…without paying anything" is irrelevant; the absence of discrimination in one area obviously does not give states a get-out-of-jail-free card to discriminate freely in others. What matters is that both applicants paid a heightened admissions fee because they are already licensed in New Jersey and Illinois, respectively. Hernandez and Drwencke would suffer the same damages regardless of where they reside. For this reason, the Rule *does* "tax an attorney's non-Florida license when it is brought into Florida"—in other words, when that attorney tries to enter the Florida legal market. It's of no constitutional significance that Hernandez and Drwencke are free to *live in* Florida and practice New Jersey or Illinois law. The Rule is unlawful because it conditions the practice of Florida law on a heightened entrance fee for attorneys with business interests elsewhere.

*Working Remotely* confirms this point. Contrary to the Board's argument, App. Br. at 31–32, that case establishes that an attorney

10

crosses state lines—and enters interstate commerce—when she obtains a license to practice in a particular state's legal market, regardless of her state of residence. *Fla. Bar re Advisory Opinion—Out-of-State Attorney Working Remotely from Fla. Home*, 318 So.3d 538, 542 (2021). That's because the location of an attorney's law practice is the state that issued her license, *not* the state where she lives or where her office is located. *See* Opening Br. at 27–29. And "even after" that attorney "has entered the State," her licenses to practice elsewhere—and the business interests they represent—are protected from "any burdens imposed by reason of [their] foreign origin." *Welton v. Missouri*, 91 U.S. 275, 282 (1875).

The bottom line: the Rule "is inherently discriminatory and operates as a tariff." *Wynne*, 575 U.S. at 565. It is therefore unconstitutional. *Id.*

### (3) Residency is not dispositive of the facial-discrimination claims in this case.

The Board's entire facial-discrimination argument teeters atop a fatally flawed foundation: that a law violates the dormant Commerce Clause *only if* it discriminates on the basis of residency. App. Br. at 25–26, 28 ("comparing similarly-situated resident and nonresident applicants is the proper discrimination analysis"). That is wrong. Of course, states may not discriminate on the basis of residency. But that type of discrimination is just one way among many to violate the dormant Commerce Clause.

The Board conjured this false premise out of thin air. No court has ever held that residency is the *sine qua non* of discrimination against interstate commerce. Instead, as the Board's chief case holds, the Commerce Clause prohibits "laws [that] discriminate purposefully against *out-of-state economic interests*." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 364 (2023) (emphasis added). It should go without saying that the Supreme Court has found violations of the Commerce Clause time and time again without any mention of residency. *See, e.g.*, *Oregon Waste*, 511 U.S. at 94 (striking down tax against garbage generated out-of-state); *Hunt v. Wa. State Apple Advert. Comm'n*, 432 U.S. 333, 351–54 (1977) (striking down North Carolina prohibition on use of Washington state's apple grading system).

The Board cites four cases to support its "residency conquers all" argument. None suggests (much less holds) that only residency-based laws can violate the Commerce Clause.

Start with *Berch* and *Castille*. Both cases raise kitchen-sink constitutional challenges to reciprocal bar admission policies. *Berch* involved an Arizona rule providing that attorneys licensed to practice in states with reciprocal admission for Arizona-barred attorneys could seek admission-on-motion in Arizona, while attorneys *not* licensed in those states could be admitted in Arizona only by taking the Universal Bar Examination (UBE). *Nat'l Ass'n for Adv. of Multijurisdiction Practice v. Berch*, 773 F.3d 1037, 1043 (9th Cir. 2014). The Ninth Circuit found no

dormant Commerce Clause violation because attorneys who weren't barred in reciprocal states could still be admitted to the Arizona bar by taking the UBE. *Id.* at 1049. *Castille* addressed a functionally identical Pennsylvania rule. *See Nat'l Ass'n for Adv. of Multijurisdiction Practice v. Castille*, 799 F.3d 216, 218 (3d Cir. 2015).

According to the Board, *Berch* and *Castille* stand for the proposition that a rule classifying attorneys "solely on state of bar admission" is permissible so long as the rule "applies equally to residents and non-residents." *Berch*, 773 F.3d at 1046; *see* App. Br. at 26–28. The Board misreads *Berch* and *Castille* and ignores enormous factual distinctions between those cases and this one.

To understand why the Board has this wrong, consider the difference between classification and discrimination. Simply because a rule *distinguishes between* attorneys based on where they are licensed to practice does not mean it *discriminates* on that basis. The rule in *Berch* merely offered different methods of admission to the Arizona bar depending on where an applicant was licensed. Rule 2-23.4, on the other hand, actually penalizes *every* attorney barred *anywhere* other than Florida. The Court in *Berch* recognized this, distinguishing the reciprocal admission arrangement before it from scenarios where an "out-of-state product was placed at a substantial commercial disadvantage through discriminatory tax treatment." 773 F.3d at 1049 (cleaned up). *No* attorney was "placed at a significant economic disadvantage by the

13

[admission-on-motion] Rule" in *Berch*, no matter where she was licensed to practice law prior to seeking admission in Arizona. *Id*.

Here, *every* attorney licensed outside of Florida for at least a year is placed at precisely that sort of disadvantage: Each must pay a substantial penalty before they may even attempt to practice law in Florida. Think of it another way. The critical distinction for Commerce Clause purposes is between in-state interests and out-of-state interests. The rules in *Berch* and *Castille* don't differentiate on that basis; the only distinctions drawn are between states with reciprocity and states without it. Here, however, there is only Florida versus every other state.

With all this in mind, the *Berch* Court concluded that there was no Commerce Clause violation not because the absence of residency-based discrimination *excused* discriminatory treatment on the basis of where an applicant was licensed to practice, but because there was no discrimination on any basis whatsoever. That's because it's not enough for states merely to avoid residency-based discrimination. The Commerce Clause does not depend solely on an individual's state of residence. States may not discriminate against interstate commerce on *any* basis, regardless of whether the chosen metric for unequal treatment is residency, the location of a business, the origin of a good, or the state where a professional license was issued.

In short, *Berch*, *Castille*, and any cases involving reciprocity and admission-on-motion are irrelevant to Rule 2-23.4, which does not simply

*classify* applicants by virtue of where they obtained their law license, but *taxes* any applicant who is already licensed anywhere but Florida.

*Tolchin* and *Sestric* are no more helpful to the Board. Like *Berch* and *Castille*, *Tolchin* involved a rule wholly unlike Rule 2-23.4: a requirement that lawyers admitted to the New Jersey bar maintain a bona fide office in that state. *Tolchin v. Sup. Ct. of N.J.*, 111 F.3d 1099, 1102, 1105 (3d Cir. 1997). To the extent *Tolchin* addresses residency at all, it's because Tolchin argued that such a rule "effectively favors resident attorneys." *Id.* at 1107. The Court rejected this claim, holding that "any burden [the rule] imposes is directly proportional to the distance an attorney must travel" to New Jersey. *Id.* at 1108. Of course, the Court did not hold that residency-based discrimination was required for Commerce Clause violations. And *Sestric*, the Board's final case, addresses residency only because the challenged regulation in that case *explicitly* targeted nonresidents: it required nonresidents who wanted to practice law in Illinois to pass the Illinois bar exam while permitting Illinois residents to be admitted on motion. *Sestric v. Clark*, 765 F.2d 655, 661 (7th Cir. 1985); *see* App. Br. at 28.

At day's end, *Berch*, *Castille*, *Tolchin*, and *Sestric* involve laws that do not remotely resemble Rule 2-23.4. These cases did not hold that residency was a necessary component of Commerce Clause discrimination. And they did not hold that the Constitution permits a

state to tax lawyers with out-of-state business interests before they may enter that state's legal market.

To the extent the Board claims its Rule is lawful because it doesn't discriminate on the basis of residency, that argument is a nonstarter.

### (4) The Board does not dispute that multiple nondiscriminatory alternatives are available.

In their opening brief, Hernandez and Drwencke set forth a number of reasonable, nondiscriminatory alternative fee structures that could serve the Board's goals. *See* Opening Brief at 31–33. The Board completely ignores all of these alternatives. By its silence, it concedes that nondiscriminatory options are indeed both available and reasonable.

In light of these alternatives, the Rule cannot survive the "strictest scrutiny" applicable to facially-discriminatory laws. *Hughes v. Oklahoma*, 441 U.S. 322, 337 (1979).

### B. The Rule Discriminates Against Interstate Commerce in Practical Effect.

The Rule discriminates in practical effect against (1) out-of-state economic interests (law licenses from states other than Florida) and (2) nonresidents of Florida. The Board argues otherwise only by misapplying the *Locke* factors, again misidentifying the relevant comparators, and ignoring the Rule's unique scheme: extracting money from nonresidents for the specific and admitted purpose of benefiting Florida residents.

16

### (1)  Drwencke did not forfeit his residency-based practical-effects argument.[1]

The Board claims that Drwencke forfeited his residency-based practical-effects argument because: (1) his motion for summary judgment argued discrimination in practical effect against out-of-state interests; (2) he argued that applicants' "physical location is immaterial to the constitutional analysis"; and (3) a key statistic Drwencke uses on appeal "was not presented to" the district court. App. Br. at 33, 37. These arguments distort the record. There was no forfeiture.

First, Drwencke clearly argued below that "the rule discriminates based upon residency *in practical effect*." Doc 98 – Pg 27. There is no basis for the Board to claim otherwise. It's true that Drwencke initially maintained that his residency-based argument was not ripe, *see* App. Br. at 33 (citing Doc 80 – Pg 7 n.2), but that's neither here nor there—

---

[1] Nor did Drwencke abandon his appeal of the district court's grant of partial summary judgment on the residency-based practical-effects discrimination claim. *Contra* App. Br. at 5 n.1. Drwencke appealed from the entire Judgment and Order in this case, including this ruling, Doc 111 – Pg 1, which was outlined in the Statement of the Case, Opening Br. at 17–18. The Board's two cases both involve arguments that were "not adequately address[ed]" in the opening briefs on appeal. *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014); *see* App. Br. at 5 n.1. Here, in sharp contrast, Drwencke spent well over *ten pages* of his initial brief explaining why the Rule discriminates in practical effect on the basis of residency, making clear that the district court's grant of summary judgment to the Board on this point was error. *See* Opening Br. at 33-46. To deem the appeal from this ruling abandoned based on the Board's hyper-technical argument "would [endorse]…an arid ritual of meaningless form." *Staub v. City of Baxley*, 355 U.S. 313, 320 (1958).

Drwencke subsequently filed an *entire brief* arguing that the Rule discriminated against nonresident applicants in practical effect, *see* Doc 98 – Pg 3 (arguing that "in practical effect, Florida's fee policy discriminates against a narrow, disfavored group of predominately out-of-state residents"); *see also* Doc 95 – Pg 2 (ordering Drwencke to oppose the Board's residency-based practical-effects argument). And the district court *resolved* this argument, holding after extensive briefing that the Rule did not discriminate in practical effect based on residency. *See* Doc 103 – Pgs 3, 6.

Second, Drwencke *did* argue that "physical location is immaterial"—but only with respect to his economic-interests argument, *not* his residency-based argument. *See* Doc 98 – Pg 29. Drwencke has always maintained that the Rule discriminates in practical effect *both* against out-of-state economic interests *and* against nonresident applicants. The immateriality language the Board references referred only to the former type of discrimination, as even the barest glance at the record will confirm.

Finally, the Board's argument that Drwencke's "87 percent" figure was not before the district court blinks at reality. This figure, and others from the same data set, appear throughout Drwencke's opposition to the Board's motion regarding residency-based practical-effects discrimination. *See* Doc 98 – Pgs 3, 5-7, 9, 11. And the district court plainly considered that statistic in resolving the motion. *See* Doc 103 –

Pg 6 (citing Doc 98-1 – Pgs 2-3) (explaining that 87 percent of applicants to the Florida bar are Florida residents).

Drwencke's residency-based practical-effects discrimination argument is properly before this Court.

### (2)  Properly applied, the *Locke* factors show discrimination in practical effect.

To the extent the *Locke v. Shore* factors apply here, they favor Drwencke. *See* 634 F.3d 1185, 1193 (11th Cir. 2011). Exclusion from the market is not a prerequisite to practical-effects discrimination, and the Rule taxes nonresidents in order to fulfill a quintessentially protectionist purpose: funding early-registration applications to the Florida bar.

### (a)  The Board's "exclusion from the market" cases are all inapposite.

In his opening brief, Drwencke showed why a rule can discriminate in practical effect even if it does not exclude nonresidents from the market. Opening Br. at 36–38. Ignoring the reams of cases in which courts found discrimination in practical effect *without* exclusion from the market, the Board offers only inapplicable quotations from three out-of-Circuit decisions with fact patterns that could not be less relevant.

In *Flynt v. Bonta*, which involved a California cardroom licensure requirement not remotely related to Florida's bar-admission fees, the Ninth Circuit neither held nor implied that market exclusion was a necessary prerequisite to practical-effects discrimination. 131 F.4th 918, 926 (9th Cir. 2025). The Board's cherry-picked quote reflects only what

19

the plaintiffs in that case *argued*, not what the Court actually *held*. *Id.* (noting that regulations "do not, *as plaintiffs suggest*, exclude all out-of-state market participants") (emphasis added).

The Seventh Circuit's decision in *Regan v. City of Hammond* is even less helpful to the Board's argument. 934 F.3d 700, 703 (7th Cir. 2019). Far from deeming market exclusion a necessary component of *practical-effects* discrimination, *Regan* held that market-exclusion cases represent such a severe violation that they are "the equivalent of a *facially* discriminatory law"—an entirely different type of Commerce Clause analysis. *Id.* (emphasis added).

And *Garber v. Menendez* is least probative of all. In that case, the Sixth Circuit explicitly acknowledged that states can discriminate in practical effect *without* excluding nonresidents from the market by merely "impos[ing] burdensome regulation on that market." 888 F.3d 839, 846 (6th Cir. 2018). By taxing a class of predominantly nonresidents to fund its in-state early-registration program and licensing operations statewide, that is precisely what Rule 2-23.4 does.

Drwencke was not obligated to show exclusion from the market to prevail on his practical-effects discrimination claim. The district court erred in holding otherwise.

> **(b)    The Rule disproportionately burdens out-of-state residents for the specific purpose of benefiting Florida's in-state interests.**

For interrelated reasons, the Board also misapplies the second and third *Locke* factors: disproportionate costs to nonresidents and protectionist purpose. Both factors favor Drwencke.

At the threshold, the Board recycles its incorrect assertion that Drwencke's comparators are not similarly situated. App. Br. at 38. Drwencke has already explained why this claim is wrong. *See supra* Part I.A. The dormant Commerce protects the "right to have access to the markets of other States on equal terms." *Granholm v. Heald*, 544 U.S. 460, 473 (2005). The relevant market here is the Florida legal market. All attorneys seeking access to that market for the first time are similarly situated. Every applicant sitting for the Florida bar exam—regardless of what year she graduated from law school—has *zero* years of experience in the Florida market. But only those applicants with out-of-state licenses, who are disproportionately nonresidents, must pay a heightened fee. That is discrimination in practical effect.

The Board's remaining practical-effects argument rises and falls on one hoary principle: laws that merely burden some nonresidents do not discriminate against interstate commerce. *See* App. Br. at 39–42 (collecting cases). True as it is, this principle does not apply here. The Rule is discriminatory not only because it "appl[ies] most often to out-of-state entities," App. Br. at 39, but also because it *taxes* a group of

predominately nonresidents *for the express purpose* of funding a program that benefits residents almost exclusively. This scheme creates a barrier around the Florida legal market and "furthers the economic Balkanization that our dormant Commerce Clause jurisprudence has long sought to prevent." *Fulton Corp. v. Faulkner*, 516 U.S. 325, 333 n.3 (1996) (cleaned up).

The laws challenged in the Board's cases could not be more different from the Rule. Unlike the Rule, all of those laws were facially neutral, and all but one neither involved a tax nor generated any revenue. *See* App. Br. at 39–41 (collecting cases). The Board's single tax case, *Virgin Islands*, didn't "create barriers against" or "place added costs upon" interstate transactions—the touchstone of Commerce Clause analysis. *Virgin Islands Am. Resort Dev. Ass'n v. Gov't of Virgin Islands*, 848 F. App'x 79, 83 (3d Cir. 2021) (cleaned up). By imposing "added costs" for out-of-state-licensed applicants to the Florida bar, the Rule does both.

Finally, the Board's threadbare protectionism argument writes crucial facts out of the record. Claiming that its Rule proposals and the Supreme Court's orders reflected no protectionist motivation, App. Br. at 42, the Board ignores what it concedes elsewhere in its brief: that the Rule's revenue "enable[s] the Board to continue offering discounted fees" for early registration, App. Br. at 17. Because the early registration fee benefits a group of attorneys who nearly all reside in Florida, Doc 98-1 – Pg 3; Doc 68 – Pg 8; Doc 69-4 – Pgs 1-283, the Rule is just a thinly-

disguised way to shore up Floridian interests. The Board spills much ink explaining that fee revenue is necessary to maintain its "critical" discounts. App. Br. at 17–19. But "[b]y itself, of course, revenue generation is not a local interest that can justify discrimination against interstate commerce." *C & A Carbone*, 511 U.S. at 393.

## II. THE BOARD AND GAVAGNI ARE NOT IMMUNE FROM HERNANDEZ'S DAMAGES CLAIMS.

### A. The Board Is Not Entitled to Eleventh Amendment Immunity.

The Board's Eleventh Amendment argument is lengthy, but it boils down to something simple: State entities are frequently afforded Eleventh Amendment immunity, and the Board has been deemed an "arm of the state" in other circumstances. App. Br. at 44–51. But these points do not establish immunity in *this* case and on *this* record. The Florida Supreme Court has declared that a "full refund" of wrongful tax payments is the "only clear and certain remedy" in these circumstances. *Kuhnlein*, 646 So.2d at 726 (holding that Florida was not entitled to sovereign immunity and requiring state to refund illegal revenue from "impact fee" tax that violated Commerce Clause). The Board can't explain why it should be immunized from refunding a squarely analogous tax.

Start with broad principles. This Circuit is unequivocal that the *Manders* test is "function-specific," *Freyre v. Chronister*, 910 F.3d 1371, 1380 (11th Cir. 2018) (citing *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003) (en banc)), and requires a "case-by-case analysis," *Silberman*

23

*v. Miami Dade Transit*, 927 F.3d 1123, 1136 (11th Cir. 2019). The issue here is "not simply whether [the Board] acts as an arm of the state generally, but whether it does so when" determining admissions fees for bar applicants. *Freyre*, 910 F.3d at 1381.

The Board invokes a parade of cases that it claims show it's immune. Most of these cases predate *Manders* and did not even involve the Eleventh Amendment. And none involved the specific function at issue here: determining admission fees for Florida bar applicants. *See Cichowski v. Totten*, No. 24-10195, 2024 WL 2182487, at *2 (11th Cir. 2024) (addressing Florida Bar, not Board, and the unauthorized practice of law, not admission fees); *Stoddard v. Fla. Bd. of Bar Exam'rs*, 509 F. Supp. 2d 1117, 1118, 1123 (N.D. Fla. 2006) (finding Board immune only with respect to function of charging attorney with unfitness to practice law); *see* App. Br. at 44–45 (collecting cases that did not involve immunity). This inapposite authority does not support the Board's position.

The Board's factor analysis is no more persuasive than its caselaw. The Board overplays the significance of the first *Manders* factor—how state law defines the entity, App. Br. at 45–46—and ignores that Florida courts have never once defined the Board as an arm of the state with respect to its role in determining and charging admission fees. As for the second factor, control, the Board dissembles about which entity is really responsible for the determination of admission fees: While the Florida

Supreme Court *approves* fee amounts, App. Br. at 47, it's the Board that sets them in the first place, Opening Br. at 9–10.

The district court correctly held that the third factor—where the Board derives its funds—favors Hernandez. Every single dollar that funds Board operations comes from Rule 2-23.4 revenue—and not one comes from the state. The Board's pre-*Manders* cases suggesting that arms of the state may sometimes "acquire funds from user fees" are irrelevant. App. Br. at 49 (citing Doc 45 – Pg 8). Nor does this Court's decision in *Ross* support immunity. There, the fact that state law required an Alabama county to fund the agency in question did not weigh against immunity. *Ross v. Jefferson Cnty. Dep't of Health*, 701 F.3d 655, 660 (11th Cir. 2012). Here, in contrast, state law requires merely that the Board fund its own work, *see* App. Br. at 48—*not* that it obtain those funds from any particular source, much less from admission fees charged to applicants with out-of-state licenses.

Finally, with respect to the fourth factor—the enforceability of money judgments against the state—the Board resorts to semantics. It claims that because the Board's authority to set application fees flows indirectly from the Florida Supreme Court, which in turn flows indirectly from the Florida itself, the money generated by Rule 2-23.4 constitutes "state funds." App. Br. at 50. It's no surprise that the Board cites no authority in support of this attenuated proposition. The funds in question came from bar admission fees the Board itself set. They are held in an

independent bank account completely separate from the state treasury. Doc 107 – Pgs 22–23. Under a long line of precedent that *Manders* did not disturb, these facts preclude immunity. *See* Opening Br. at 50–51.

The facts of this case are exceptional, but the remedy Hernandez seeks is not. For decades, the Board has unlawfully taxed Florida bar applicants who have business interests in other states. As in *Kuhnlein*, a "full refund" here is required. *Kuhnlein*, 646 So.2d at 726.

### B.    Gavagni Is Not Entitled to Qualified Immunity.

The Board devotes two scant paragraphs to qualified immunity. App. Br. at 52–53. They decline to confront the specifics of *Oregon Waste* or any of the other tax cases that make one key principle very clear: states may not tax items of commerce when they cross state lines to enter the intrastate market.

The Board's only concrete argument is that the Supreme Court of Florida approved the Rule in 1996 and 2010. As Hernandez has already explained, *see supra* Part I.A.1, this evasive argument rewrites history. The Board never disclosed the *true* purpose behind Rule 2-23.4—funding all of the Board's operations and Florida's early-registration program— until this litigation was well underway, instead strategically presenting the Rule as a mere compensatory tax. The Florida Supreme Court's approval of the Rule based on the Board's misleading proposal does not diminish the Rule's clear unconstitutionality *on this record*.

26

Every reasonable official in Gavagni's shoes would have known that Florida cannot lawfully tax applicants who are licensed out-of-state—and only those applicants—for the express purpose of funding in-state discounts. Indeed, the Board's early attempt to invoke the compensatory-tax exception to *Oregon Waste* reveals that Gavagni was plainly on notice of that case and its application to the Rule. However novel its particulars, Rule 2-23.4 recites the same old unconstitutional story.

### C.  The Board's Alternative Arguments for Dismissing the Claim Against Gavagni All Fail.

None of the Board's alternative grounds for dismissing the personal-capacity claim against Gavagni—failure to state a claim, legislative immunity, and quasi-judicial immunity—are successful.

Hernandez stated a viable dormant Commerce Clause claim against Gavagni in her personal capacity. He pleaded an array of detailed facts showing Gavagni's personal involvement in the Rule 2-23.4 scheme. *See* Doc 107 – Pgs 17–18, 28, 36, 38–41. Dismissal is not warranted simply because some of those facts—which are "peculiarly within the possession and control of the defendant"—were pleaded on information and belief. *Belik v. Carlson Travel Grp., Inc.*, 864 F. Supp. 2d 1302, 1311 (S.D. Fla. 2011). *Contrast* App. Br. at 53.

Neither legislative nor quasi-judicial immunity protects Gavagni from suit. Judicial immunity applies only where the act in question is judicial in nature, regardless of the actor's title. *See, e.g., Forrester v.*

27

*White*, 484 U.S. 219, 227–29 (1988) (denying a judge absolute immunity for non-judicial acts). Here, Gavagni's role in determining admission fees did not remotely amount to a "function normally performed by a judge." *Stump v. Sparkman*, 435 U.S. 349, 362 (1978). Likewise, legislative immunity governs only true legislative acts, not discretionary policy decisions like the Rule's tax on out-of-state interests. *See Gravel v. United States*, 408 U.S. 606, 622–27 (1972).

## <u>CONCLUSION</u>

This Court should: (1) reverse the dismissal of Hernandez's damages claims; (2) reverse the dismissal of the facial-discrimination claim and enter judgment on that claim in Drwencke's favor; (3) reverse the denial of Drwencke's motion for partial summary judgment on the practical-effects discrimination claim; and (4) reverse the grant of the Board's motion for partial summary judgment on the practical-effects discrimination claim.

Date: May 30, 2025             Respectfully submitted,

<u>s/ Emma Freeman</u>
Emma Freeman
  *Counsel of Record*
APOLLO LAW LLC
1000 Dean Street
Suite 101
(646) 363-6766
emma@apollo-law.com

28

Adam W. Hansen
APOLLO LAW LLC
333 Washington Avenue North
Suite 300
Minneapolis, MN 55401

Michael J. DeBenedictis
Efthimios Parasidis
DEBENEDICTIS & DEBENEDICTIS LLC
1415 Route 70 East, Suite 103
Cherry Hill, NJ 08034

*Counsel for Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify pursuant to Fed. R. App. P. 32(g)(1) that the Appellant's brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this Brief contains 6,496 words, in other words, no more than 6,500 words, including footnotes and excluding the parts of the Brief exempted by Fed. R. App. P. 32(f). In addition, this Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this Brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016, Century Schoolbook font in 14 point size, with footnotes in Century Schoolbook font in 14 point size.


<u>s/ Emma Freeman</u>
Emma Freeman

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 30th day of May, 2025, I caused the foregoing brief and addendum to be filed electronically with the Court, where they are available for viewing and downloading from the Court's ECF system, and that such electronic filing automatically generates a notice of electronic filing constituting service. I certify that all parties required to be served have been served.

<u>s/ Emma Freeman</u>
Emma Freeman